**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name ___Avila_____Mario_____( M.A.)___
       (Last)       (First)      (Initial)

Prisoner Number ___#V86646_____

Institutional Address ___California State Prison/Sacramento___
P.O.Box 29 Represa,California 95671-0066

=====================================================

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Mario Avila    (Petitioner)
(Enter the full name of plaintiff in this action.)

       vs.

James L. Walker,

_____(Respondent)

_____

_____

(Enter the full name of respondent(s) or jailor in this action)

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT OF HABEAS CORPUS**

CV 08 2882

E-filing

=====================================================

**Read Comments Carefully Before Filling In**

**When and Where to File**

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS    - 1 -

1    Who to Name as Respondent

2           You must name the person in whose actual custody you are.  This usually means the Warden or

3    jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5    respondents.

6           If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now and the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10    A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11           1. What sentence are you challenging in this petition?  17 years and 14 months
to be followed by a sentence of 30 years to life

12           (a)    Name and location of court that imposed sentence (for example; Alameda

13           County Superior Court, Oakland):

14           Monterey County _____    _____ Salinas, Ca. _____

15           Court                                Location

16           (b)    Case number, if known _____ No.SS032725A _____

17           (c)    Date and terms of sentence __ May 12, 2005 _____

18           (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19           parole or probation, etc.)      Yes X ___     No _____

20           Where? C.S.P/Sacramento/New Folsom

21           Name of Institution: California State Prison/Sacramento

22           Address: P.O.Box 29 Represa,Ca.95671-0066 _____

23           2. For what crime were you given this sentence?  (If your petition challenges a sentence for

24    more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25    challenging more than one sentence, you should file a different petition for each sentence.)

26    On March 17,2004, Petitioner was charged by amended information
with crimes arising from three seperate incidents: 1. Street

27    Terrorism and Brandishing, May 22, 2003: Count 3, threats of
violence(§ 422) with enhancements for street terrorism (§186.22

28    (Continued attached page) 5/6(a) (also,counts two and three are
on attached pg. 5/6(a)).

PET. FOR WRIT OF HAB. CORPUS        - 2 -

1  (contiued from pg.2) ,subd.(b)(1)) and use of a firearm(§ 12022.5,
   subd.(a).); Count, 4 street terrorism (§ 186.22,subd. (a)) with an
2  enhancement for use of a firearm (§ 12.022.5, subd.(a)(2)) with an
   enhancement for street terrorism(§ 186.22,subd.(d));
3

4  **2. Robbery, late July/early August 2003:** Count 6, second degree
   robbery (§ 211) with an enhancement for street terrorism ( § 186.22-
5  ,subd.(b)(1));
   Count 7, assault with a deadly weapon (245, subd.(a)(1)) with enhan-
6  cement for strett terrorism (§ 186.22, subd.(b)(1);

7  Count 8, street terrorism (§ 186.22,subd.(a)).

8  **3. Shooting, September 1, 2003:** Count 1, shooting at an occupied
   vehicle (§ 246) with an enhancement for strett terrorism
9  Count 2, street terrorism (§ 186.22, subd. (a)) with an enhancement-
   for use of a firearm(§ 12022.5, subd.(a));
10 The information also alleged a prior juvenile conviction for robb-
   ery. (1 C.T.pp 266-272.) Count three was not submitted to the jury.
11
   **Issue # One** :
12 (continued from pg.6) percipient witness to the robbery did not

13 report that his assilants wore gang colors, threw gang signs, utter-

14 ed gang words or threats, or in any other way identified themselves

15 as gang members. Standing alone, the government's opinion testimony

16 is insufficient to support the enhancement (Jackson v. Virginia,

17 (1979) 443 U.S. 307))

18 **Issue # two:**
   (continued from pg.#6. Claim Two.) ginton(2004) 541 U.S 36.

19
   **Issue # three:**
20 (continued from pg.6. Claim three.

21 members were outside the courtroom, (2) Failing to request an evide-

22 ntiary hearing on wheather any jurors were biased by their own

23 observations of gang members inside and outside of the courtroom

24 and (3) Failing to object to the use of Petitioner's juvenile

25 adjucation as a prior strike. (Strickland vs. Washington, (1984)

26 466 U.S. 668)).

27

28
                              5/6(a)

3. Did you have any of the following?

    Arraignment:               Yes _X_    No _____

    Preliminary Hearing:      Yes _X_    No _____

    Motion to Suppress:       Yes _____    No _X_

4. How did you plead?

    Guilty _____    Not Guilty _X_    Nolo Contendere _____

    Any other plea (specify) ____no_____

5. If you went to trial, what kind of trial did you have?

    Jury _X_    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?        Yes _____    No _x_

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment           Yes _X_    No _____

    (b)    Preliminary hearing    Yes _X_    No _____

    (c)    Time of plea          Yes _____    No _____

    (d)    Trial                Yes _x_    No _____

    (e)    Sentencing           Yes _x_    No _____

    (f)    Appeal              Yes _X_    No _X_

    (g)    Other post-conviction proceeding    Yes _____    No _X_

8. Did you appeal your conviction?        Yes _X_    No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal           Yes _x_    No _____

        Year: _2007_    Result:___Conviction affirmed___

        Supreme Court of California    Yes _X_    No _____

        Year: _2007_    Result:___denied_____

        Any other court           Yes _____    No _X_

        Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1    petition?                                    Yes __X__    No_____

2    (c)    Was there an opinion?               Yes __X__    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                 Yes _____    No__x__

5           If you did, give the name of the court and the result:

6    _____ none _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?        Yes _____    No__X__

10         [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition.  You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15    U.S.C. §§ 2244(b).]

16         (a)    If you sought relief in any proceeding other than an appeal, answer the following

17                questions for each proceeding.  Attach extra paper if you need more space.

18         I.    Name of Court: _____

19               Type of Proceeding: _____

20               Grounds raised (Be brief but specific):

21               a._____

22               b._____

23               c._____

24               d._____

25               Result: _____ Date of Result:_____

26         II.   Name of Court: _____

27               Type of Proceeding: _____

28               Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS            - 4 -

1   a._____

2   b._____

3   c._____

4   d._____

5   Result: _____ Date of Result:_____

6   III.   Name of Court: _____

7          Type of Proceeding: _____

8          Grounds raised (Be brief but specific):

9          a._____

10         b._____

11         c._____

12         d._____

13         Result: _____ Date of Result:_____

14  IV.    Name of Court: _____

15         Type of Proceeding: _____

16         Grounds raised (Be brief but specific):

17         a._____

18         b._____

19         c._____

20         d._____

21         Result: _____ Date of Result:_____

22  (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                  Yes ___x___    No___X____

24         Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26      State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27  support each claim.  For example, what legal right or privilege were you denied?  What happened?

28  Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1   need more space. Answer the same questions for each claim.

2          [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5          Claim One: Substantial Evidence Does Not Support An Enhancement

6          For Street Terrorism In Connection with count 6

7          Supporting Facts:   The record lacks substantial evidence to

8   support the gang enhancement(s) on the robbery count. The

9   only evidence supporting the enhancement is conjectural opini-

    on testimony from the government's gang expert. The sole

10  (CONTINUED ON ATTACHED Pg. 5/6(a))

11         Claim Two: The Sixth Amendment Right To Confrotation Also

12          Bars Addmision Of 911 Tape Recording

13         Supporting Facts:   Because the statements on the 911 tape indisp-

14  utably hearsay(and, in some cases multipal hearsay), and

    declarant did not testify either at the trial or preliminary

15  hearing, the only issues in dispute here are wheather the 911

16  tape's hearsay statements are "testimonial" (Crawford v. Washin-

    (continued on attached pg.5/6(a))

17         Claim Three:   Trial counsel provided Ineffective Assistance

18          of Counsel (1) Failing to object to testimony that gang

    (continued on pg.5/6(a))

19         Supporting Facts:   Kealohapaole v. Shimoda(9th Cir.1986) 800 F.2d

20  1463, 1466 [due process is violated if the addmission of evide-

    nce renders trial fundamentally unfair], cert.denied (1987)

21  479 U.S. 1068; Jammal Van de Kamp (9th Cir. 1991) 926 F.2d 918,

22  (continued on attached pg.7(a))

    (Issue four both claim and supporting facts on page 7(a))

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS          - 6 -

(continued from pg.6. <u>Supporting facts,claim three</u>

919-920[same] Leavitt v. Arave (9th Cir. 2004) 383 F.3d 809,829

[same], cert. denied (2005) 125 S.Ct. 2540).

<u>Issue # four</u>

<u>Claim Four</u>: The trial court's imposition of an upper term sentence

violated Petitioners federal constitutional rights  to a jury trial.

<u>Supporting Facts</u>: The trial court here violated the rule(s) set

forth in **Blakely vs. Washington (2004)** 542 U.S. 296 and **Apprendi vs.**

**New Jerse**y (2000) 530 U.S. 466, by imposing an upper term based on

its aggravating facts not found by the jury. " Other than the fact

of a prior conviction, any fact that increases the penalty for a

crime beyond the prescribed statutory maximum must be submitted to

a jury, and proved beyond a reasonable doubt."

7.(a)

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2 are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3 of these cases:

4 _____

5 _____

6 _____

7 Do you have an attorney for this petition?     Yes_____  No__X__

8 If you do, give the name and address of your attorney:

9 _____

10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11 this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13 Executed on __6/ 3 /08_____    X_____

14      Date          Signature of Petitioner

15

16

17

18

19

20 (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS   - 7 -

E-filing

# EXHIBIT COVER PAGE

A

EXHIBIT

## CV 08    2882

Description of this Exhibit: Appellate Court Opinion

Number of pages to this Exhibit: __31__ pages.

JURISDICTION:   (Check only one)

| | |
|---|---|
| [  ] | Municipal Court |
| [  ] | Superior Court |
| [  ] | Applellate Court |
| [  ] | State Supreme Court |
| [x] | United States District Court |
| [  ] | State Circuit Court |
| [  ] | United States Supreme Court |
| [  ] | Grand Jury |

**COPY**

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H028881 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS032725A) |
| v. | |
| MARIO AVILA, | |
| Defendant and Appellant. | |

Court of Appeal - Sixth App. Dist.

**FILED**

APR 17 2007

MICHAEL J. YERLY, Clerk

By _____
DEPUTY

Defendant Mario Avila, a Norteño gang member since 1997, was found guilty at jury trial of assault, street terrorism, robbery, and firearms offenses with gang and firearm enhancements, arising from three separate incidents against the same victims in Salinas in 2003. The trial court imposed a determinate sentence of 17 years, four months followed by an indeterminate term of 30 years to life. On appeal, defendant challenges the admissibility of the evidence, the competence of counsel, and the court's selection of the upper term sentence.

### FACTS

**May 22, 2003 (counts 3, 4, and 5)**

Around 8:30 p.m. on May 22, 2003, Jorge Soto, his wife, Rene Martinez, their teenage daughter, Kelli, and a friend were walking down North Sanborn Street when a gold car with black tinted windows approached. Soto recognized two of the four occupants: defendant, a back seat passenger, and the driver, gang member Juan "Chucky" Ortiz, who lived on the same street as Soto used to. Defendant, Ortiz, and the

actively participating in a criminal street gang with knowledge that the members engaged in a pattern of criminal activity and promoted felonious conduct by gang members. Count 5 alleged that defendant exhibited a firearm (§ 417, subd. (a)(2)) in the presence of Soto, Martinez, and Kelli for the benefit of and with the intent to promote criminal conduct by gang members. (§ 186.22, subd. (d).)

**July 2003 (counts 6, 7, and 8)**

At approximately 5:00 p.m. near the end of July, Francisco Medina walked from his house on Fremont Street down to the Azteca Market. He had to pass by 501 Fremont Street, the house at the corner which was the center of Norteño gang activity. The market was also on Norteño turf. Medina purchased two sodas that came in glass bottles.

As Medina left the market, he saw defendant and Manuel Baeza, who lived four houses down the street from 501 Fremont Street. They were both gang members Medina recognized from the neighborhood. Medina had seen their tattoos (defendant had a tattoo in red of women's lips on his neck, and Baeza had the abbreviation of Fremont Street and an "x" and a "4"). They were with another man in the market parking lot.

Baeza demanded Medina's wallet. When Medina refused, Baeza hit him in the face, knocking him to the ground, where the three men started kicking him. The assault continued for about a minute. As Medina stood up, defendant grabbed and held Medina and Baeza stabbed him in the back with a glass shard from one of the soda bottles. When people came out of the market to investigate, the three assailants fled, taking Medina's wallet with them.

The piece of glass cut through Medina's jacket, shirt, and skin, and the wound bled so much that Medina later discarded the shirt. The wound healed by the time of the trial, but the scar was still visible. Medina did not seek treatment or report the matter to the police for fear of retaliation from defendant. He was afraid that if defendant and his friends saw a police car near his house, they would "do something more against my family."

3

went through the car's right rear fender and into the wheel well, coming to rest in the trunk between the back seat and the gas tank. Soto testified that if the path of the bullet veered "a little bit more, it would have hit the gas tank, and [defendant] could have killed the whole family."

Soto immediately drove to the nearest police station for help. However, no one was stationed at the front desk, so Martinez used the phone in the lobby with a direct line to the police 911 operator while everyone else waited outside. The tape of the 911 call was played for the jury over defendant's objection. During the call, Martinez described the shooting, the assailants, and the fact that she had previously testified against one of the gang members about an incident at which defendant—the shooter in this case—was also present. She spoke of Medina's stabbing and robbery, and Medina's father's robbery a few months earlier. "It's that little store. They hang out and they rob people. And then I had to take him [Medina's 56-year-old father] to the hospital with a busted head and he's got a heart problem. And now they stabbed the son with a beer bottle, and now they're shooting at us!" Martinez repeatedly expressed fear for her family and explained that defendant and the gang were "partying" at a house only four doors away from her home.

Responding Officer Dagoberto Zubiate testified that he met the group in the police department lobby. Martinez was "upset, to the point she became hysterical; she was crying and pacing back and forth, and repeatedly told me that, you know, she was afraid for her safety, that she was afraid to testify, and she feared retaliation from the gang members."

Only Medina was willing to return to the scene with officers on the night of the shooting. Soto was concerned about giving his real name because of problems his family might face from defendant and the gang. However, all the victims gave statements to the officers and Soto, Medina, and Kelli identified defendant as the shooter.

5

was commonly funneled back to incarcerated members of the Nuestra Familia prison gang.

Burnett stated that gang culture lives on intimidation and fear. She listed a number of predicate crimes involving Norteños that were not committed against rival gang members, but were still specifically committed for the Norteño gang. Gang members use violence and intimidation against innocent civilians not just to enhance their status in the gang, or their gang's status among other gangs in a particular area, but to intimidate residents on their turf so they can commit other crimes without the fear that the citizens will report them to the police or testify against them. "If the victim and citizens of the community, and rival gang members fear them, they won't report these crimes and, therefore, they avoid prosecution." The gang will specifically target those individuals that have testified against them in the past, or who have reported their actions to the police. Burnett mentioned one incident in which a hospitalized gang member lunged at a witness in an effort to intimidate him when police brought the witness in to identify the suspect.

In Burnett's opinion, defendant, who had been shot weeks before the September shooting, would be expected to retaliate violently. Burnett thought defendant would not necessarily retaliate against the rivals who injured him but would uphold his—and the gang's reputation—by inflicting seemingly random violence on virtually anyone, regardless of whether he or she was affiliated with a rival gang. Eighty-five percent of "gang-related" shootings in Salinas are committed without regard for whether the victim is a gang member. Burnett stated, "[The gang members] just don't care who it is. They are just out to shoot somebody."

Shooting at a car that is on gang turf, even if the driver is not a member of a rival gang, benefits the shooter's gang because it is seen as an act of controlling their territory. Moreover, a shooting committed in front of fellow gang members enhances the shooter's reputation and status within the gang, regardless of whether the victim is a rival gang

7

(2) the trial court erred in admitting the tape of Martinez's 911 call from the police lobby; (3) trial counsel was ineffective because he failed to: (a) object to testimony that gang members were outside the courtroom, (b) request an evidentiary hearing whether jurors were biased by their own observations of gang members inside or outside the courtroom, and (c) object to the use of defendant's juvenile adjudication as a strike prior; finally, (4) the trial court's imposition of an upper term sentence violated *Blakely v. Washington*[2] and defendant's constitutional right to a jury trial.

### SUFFICIENCY OF THE EVIDENCE

Defendant claims the evidence is insufficient to support a true finding on the enhancement that the robbery of Medina was for the benefit of a criminal street gang because Medina did not testify that the assailants wore gang colors, threw gang signs, uttered any gang words or threats, or in any other way identified themselves as gang members, and witnesses, who came out of the store after the attack before the assailants fled, also gave no such testimony. Defendant concludes that "[b]ased on the percipient witness' testimony, therefore, nothing distinguishes this event from a non-gang-related street mugging." (Italics removed.)

In assessing a sufficiency of the evidence argument, the test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) The court must view the evidence in light of the whole record, drawing all inferences in favor of the judgment and must presume the existence of every fact in support of the judgment that could reasonably be deduced from the evidence. To uphold a conviction, the record must contain evidence that is reasonable, credible, and of solid value such that any rational trier of fact could have been persuaded of the defendant's guilt. (*People v.*

---

[2] *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*).

9

testimony may help the jury understand the significance of particular acts in light of gang culture and habits. (*Ferraez*, *supra*, 112 Cal.App.4th at p. 930.)

In the instant case, there was ample testimony that defendant was a gang member. The defense conceded the matter in jury voir dire. Officer Eulalio Villegas, assigned to the violence suppression unit, testified that he had contacted defendant several times in the past, and saw defendant wearing red, a color associated with Norteños, associating with several other gang members. Defendant had a tattoo of a kiss (a pair of lips) in red ink on his neck. Villegas had seen other tattoos on defendant's person but had not taken notes or pictures of them. Villegas thought the lips were a gang-related tattoo because he had seen two other individuals whom he knew to be gang members who had the tattooed lips on the same place on the neck and he had not seen the tattoo on persons who were not gang members. Also, defendant admitted to Villegas that he was a member of the Norteños.

In addition, Soto, Martinez, Kelli, and Medina knew defendant, Ortiz, and Baeza as gang members. Medina had seen defendant's "kiss" tattoo and the Fremont Street abbreviation, the "x" and the "4," on Ortiz. Ortiz on occasion dressed all in red, the gang color, and the number 5 or 05 on the football jersey defendant was wearing on the night of the shooting was red. The victims knew the house at 501 Fremont, where defendant was seen drinking beer in the front yard with other gang members before the shooting, was the heart of gang activity. Medina knew the Azteca Market was on gang turf. When he was knocked down, kicked, stabbed, and robbed after buying his sodas, he did not report the matter to the police in case defendant and his gang would "do something *more* against [his] family." (Italics added.) Medina believed the robbery was in retaliation because he had reported a gang-related assault and robbery of his father in the past.

Martinez knew about both Medina's and his father's assault and robbery; she had taken Medina's father to the hospital. Martinez had testified at Ortiz's parole violation

11

## ADMISSION OF THE 911 TAPE

Next, defendant contends that the trial court abused its discretion in admitting Martinez's statement via the 911 tape. He asserts the statement was not admissible under the spontaneous utterance exception (Evid. Code, § 1240) because of the opportunity for "collusion" during the 10-minute time lapse between the shooting and the making of the statement; certain portions of the statement (such as Martinez's recollection of the robberies of Medina and his father) did not relate to the shooting itself; and finally, even if the statement satisfied the spontaneous utterance exception, its admission violated his rights under the Sixth Amendment Confrontation Clause because Martinez did not testify at trial and was not subject to cross-examination.

"Evidence of a statement is not made inadmissible by the hearsay rule of the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) " '(1) [T]here must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) " 'The basis for this circumstantial probability of trustworthiness is "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' " Whether a statement was made spontaneously is a question of fact in which the trial court is vested with its broadest discretion. (*Ibid.*)

Courts look to the totality of the circumstances in determining whether a statement was spontaneous. "[T]he mere ' " 'lapse of time between the event and the declarations

now they're shooting at us!" These statements, and that "they 'hang out and . . . rob people'—do not 'relate to the circumstance of the occurrence preceding it,' namely the shooting . . . [and] they do not 'narrate, describe, or explain . . . an event perceived by' Martinez." Defendant says the only way Martinez could have had the information about Medina's being robbed "was by discussing the matter with Medina during the ride to the police station." However, examination of Martinez's remarks as a whole shows that defendant's last inference is unfounded.

The trial court reasonably found Martinez's 911 call to have been made under the stress and excitement of the shooting just 10 minutes before the call. After listening to the tape, the court noted that Martinez "was audibly upset and excited by the episode." The responding officer described her as "upset, to the point she became hysterical; she was crying and pacing back and forth, and repeatedly told [him] . . . she was afraid for her safety, that she was afraid to testify, and she feared retaliation from the gang members." The 911 operator repeatedly attempted to calm Martinez down and repeatedly reminded her she was inside a police station, but Martinez kept focusing on the children in the car. The language Martinez employed during the call shows a lack of reflection. Not only are her recollections of the incident and her beliefs as to the motivation for it presented chaotically, but Martinez was unable to calm herself sufficiently to listen to and respond to the operator's questions. Martinez's statements were apparently generated from her own internal responses to a life-threatening, frightening attack.

Even the statements defendant claims referred to actions beyond the shooting itself were relevant to "narrate, describe, *or explain*" the incident. (Evid. Code, § 1240, subd. (a), italics added.) Martinez's statement of belief in the motivations of the attackers assists in identifying the perpetrators and gives a possible explanation for the attack. (*People v. Farmer* (1989) 47 Cal.3d 888, 905.) These statements of Martinez explained the incident both by providing further details about the identity of the others involved in

15

stabbing was not in self-defense. The defense objected unsuccessfully that admission of the statements violated the confrontation clause. (*Crawford, supra*, 541 U.S. at pp. 38-40.) The United States Supreme Court granted certiorari to determine that issue. (*Id.* at p. 42.)

The Sixth Amendment Confrontation Clause provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " (*Crawford, supra*, 541 U.S. at p. 42.) This guarantee applies not only to in-court testimony, but also to out-of-court statements introduced at trial, regardless of admissibility of statements under the law of evidence. (*Id.* at p. 51.) The Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. . . . [¶] Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' [citations] . . . ; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing. [¶] Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." (*Id.* at pp. 51-52.)

17

The statements were made shortly after the time of the incident. Martinez and the other occupants of the car drove immediately to the police station. Soto and Medina testified at trial that the occupants of the car did not talk to each other about the shooting because they were nervous, upset, and frightened. Soto said Martinez was "very nervous and . . . we were all scared."

It is clear even from a transcript of the tape how excitable and upset Martinez was. In addition, Officer Zubiate, who was called in to the police department to take a report from the victims, stated, "[a]ll six individuals were upset. I believe the females had been crying, and they were pacing back and forth in the lobby. And they kept looking out the front doors of the lobby, and they repeatedly stated that they were afraid. [¶] . . . [¶] All of them expressed that they feared for their safety, they feared retaliation because of past threats from gang members."

There was nothing in the statements or in the transcript to suggest that Martinez gave her statements with the thought that they would be used in court for evidence or that the police questioners asking her what happened were seeking her statements for use in court. It would be unreasonable to prohibit evidence concerning spontaneous declarations in every case where they are promoted by a simple inquiry as to what happened. (*People v. Solomon* (1969) 1 Cal.App.3d 907, 911.) Clearly, Martinez was reporting a crime and seeking help, and the operator was trying to get enough information from her for police to conduct an investigation. The evidence fully supported the court's ruling. The use of Martinez's spontaneous statement as a firmly rooted exception to the hearsay rule did not violate defendant's right of confrontation of witnesses. (*People v. Alvarez* (1996) 14 Cal.4th 155, 187.)

---

now, ok?" The operator finally told Martinez to bring everybody inside the police department, lock the doors, and stay inside and the tape ended.

19

learned from jurors that they had seen gang members in the courtroom and courthouse, were concerned for their safety, and had conversed with the bailiff about gang members.

The People counter that although "some of the jurors in the case expressed legitimate concerns regarding safety, [defendant's] trial counsel used the evidence [in closing argument] to play upon the jury's fear and convey a message that [the] prosecution was attempting to use 'scare' tactics to bolster an otherwise 'weak' case. In light of the ample evidence of gang activity in the case, and the overwhelming evidence of [defendant's] guilt of all three offenses, counsel's decision to turn the jurors' fears back upon the prosecution's case was reasonable. Furthermore, for the same reasons, counsel's failure to act could not have been prejudicial, even it if was not done for strategic reasons."

To prevail on a claim of ineffective assistance of counsel, a defendant must show not only (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, but also (2) that, as a result, the defendant was prejudiced, i.e., there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.) "[I]n order to establish ineffective assistance of counsel, a defendant must show that counsel committed 'errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " (*Morris v. State of Cal.* (9th Cir. 1991) 966 F.2d 448, 456, cert. den. 113 S.Ct. 96 (1992).)

Prevailing norms of practice are guides to determining what is reasonable, but they are only guides. There is a wide range of reasonable professional conduct and a strong presumption that counsel's conduct fell within that range. (*Strickland v. Washington* (1984) 466 U.S. 668, 688-689 (*Strickland*).) "In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions. [Citation.] Were it otherwise,

21

assist the jury in determining the credibility of the various witnesses who braved the Norteño gauntlet to testify."

The basis for defendant's first complaint, counsel's failure to object to testimony about gang members outside the courtroom, arose after Officer Burnett testified about the origin, history, inner workings, and techniques of the gangs. After explaining how the gang members try to intimidate local residents and store owners from reporting crimes, and to keep witnesses from testifying, "[i]mmediately thereafter, Officer Burnett, prompted by prosecuting counsel, strongly suggested to the jurors that Norteño[] gang members were systematically engaged in intimidation in this very trial." Burnett testified to observing "unusual activity outside the courtroom" and named a number of "admitted Norteño[] gang members" and a "high in status" Nuestra Familia gang member who were watching the courtroom. She also observed defendant's family and others whom she had named with picture phones and contacted "one of the females and asked her if she was taking my picture."

Defendant claims that this testimony had no legitimate bearing on the offenses charged and it tended to evoke an emotional bias against defendant and would have excluded it if counsel objected. Defendant is wrong.

Evidence of a defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—is relevant and admissible regarding a charged offense, as evidence can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Furthermore, Burnett's testimony about the goings-on at the courthouse was that of a percipient witness to the "roaming," gang member surveillance of the courtroom, and taking pictures of witnesses. Her observations were probably more informed than those of most witnesses to the activity because she knew or knew of the persons involved and because of her specialized training and knowledge in Salinas street

23

The next morning, after a note from a juror and a hearing in chambers, during which the juror described her fear to the court and said it would prevent her from being able to reach a decision in the case, the court excused the juror for cause. Defense counsel stated it was becoming "more clear" that with the testimony of Burnett the day before and the "transportation issue that this juror just described . . . , it seems it has increased a sense of fear among the jurors." Trial counsel stated he thought other jurors might also be thinking "that the Court or the sheriff believes that they are in danger" and he asked the court to address that "directly, because I feel like we're getting increasingly to the point where this jury cannot maintain objectively what we're hoping for them to do." The court declined to solicit information from the jurors but addressed the jurors thusly:

"I wanted to tell you that in response to some concerns that a couple of jurors expressed yesterday, we made arrangements to bring a bus in—actually the bus that transports county employees and jurors from the courthouse to the parking lot over by the train station on a routine basis everyday. We had them come and take you as a group out to your cars. In doing that, I certainly did not mean to create an impression that I have any concern about your safety. . . . [W]ell, let me state that differently. Of course, I have concern about your safety, but I have no reason to believe that there's any problem in that area with respect to any of you. [¶] I've been doing this for 33 years. We've all been involved in countless jury trials involving charges of violence in gang violence [*sic*], and we've never had an episode in this county where a juror has been in any way harmed as a result of this court connection. So I have no specific reason to feel that there's any problem. We took some action to assuage some of the concerns some jurors had, and I don't want to make it appear that—that those concerns have any actual basis. But at the same time where people have those concerns, I don't want to just leave them worrying about them either. That's why we did what we did."

25

could not help but observe examples of that behavior while they were about their lawful business coming and going to the courtroom.

Consequently, there was no juror misconduct for defense counsel to seek inquiry into. In a case of even more egregious intimidation, it was held that a juror did not commit misconduct, even inadvertently, where the juror, who was already fearful of defendant's family, observed defendant's family members parked outside her home, even if the persons were arguably there to intimidate her into changing her vote in favor of the defendant, since there was no communication, no gestures, and no display of weapons. (*In re Hamilton* (1999) 20 Cal.4th 273, 306.) In our case, there were similarly no complaints by the jurors that gang members attempted communication, gestured, or displayed weapons to them. The jurors did not even complain that photographs *had* been taken of them or that they *had* been harassed going to and from their cars. The photos were a "potential" concern and harassment was a possibility that "might" happen. We are satisfied there was no substantial likelihood that the jurors were actually biased in the sense that they were unable to render a verdict based solely on the evidence received at trial. (*Nesler, supra,* 16 Cal.4th at pp. 583-585.)

Defendant complains that jurors spoke to the bailiff about the gang members and sent a note (written by that bailiff) to the court. First, the bailiff was the jurors' conduit to the court. Via the note, the jurors properly brought their concerns before the court. The one juror who asked to be released from jury service because of her fears properly had a hearing outside the presence of the other jurors and the court made an individualized decision based on the evidence she presented. The other jurors had not brought any matters to the court's attention that required inquiry on an individualized basis, and the court properly acted to assuage the general concerns of the remaining jurors without suggesting fears that had not originated with the jurors. Furthermore, the jurors did not discuss the facts of the case with the bailiff; they discussed their observations and the stress it caused them for the purpose of having their concerns communicated to the court.

27

Counsel then raised questions in great detail about the ability of the percipient witnesses to make the observations they claimed to have made or their motives for testifying to facts that they did (including questioning whether Soto and another witness had moved on from a possible earlier rival gang affiliation) before going on to other aspects of the case.

Counsel made a reasonable tactical decision under the circumstances of this case. Gang evidence is admissible to show gang presence of activity at or near a courthouse (*People v. Carter* (2003) 30 Cal.4th 1166, 1201), motive (*People v. Frausto* (1982) 135 Cal.App.3d 129, 141), whether harassment and graffiti should be taken seriously as witness intimidation or whether they constituted nothing more than empty threats (*Olguin, supra,* 31 Cal.App.4th at p. 1368), to assist the jury in assessing the credibility of witnesses who were threatened by gang members (*Sanchez, supra,* 58 Cal.App.4th at p. 1449), to assist in determining credibility where a witness testifies he or she is afraid to testify (*People v. Warren* (1988) 45 Cal.3d 471, 478) or is fearful of retaliation (*People v. Malone* (1988) 47 Cal.3d 1, 30).

Counsel was not deficient in failing to object to the admission of such evidence. "The prejudice that [Evidence Code] section 352 [probative value outweighed by prejudicial effect] ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of a substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009.)

29

*Najera* (1972) 8 Cal.3d 504, 508-512); and (3) federal double jeopardy bars a second trial on a greater offense after the jury is discharged (*Brown v. Ohio* (1977) 432 U.S. 161, 166-168; *United States v. Blanton* (9th Cir. 2007) [476 F.3d 767] [no retrial on sentencing factors that under *Apprendi* should have been proven, but were not, at the initial trial]) and bars holding part of the trial before a different jury. (*Oregon v. Kennedy* (1982) 456 U.S. 667, 671-672.)"

The judgment is amended to reflect middle term sentences on counts 2, 7, and 8. (§ 1260.)

## DISPOSITION

The clerk of the superior court is ordered to correct the abstract of judgment to reflect midterm sentences on counts 2, 7, and 8 and forward a corrected abstract of judgment to the Department of Corrections. The judgment is affirmed.

# EXHIBIT COVER PAGE

<div style="border:1px solid">B</div>

EXHIBIT

Description of this Exhibit:    Supream Court denial

Number of pages to this Exhibit: _____ pages.

JURISDICTION:   (Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Applellate Court |
| ☐ | State Supreme Court |
| X | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Supreme Court |
| ☐ | Grand Jury |

Court of Appeal, Sixth Appellate District - No. H028881
**S152964**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

MARIO AVILA, Defendant and Appellant.

The petition for review is denied.

Kennard, J., is of the opinion the petition should be granted.

SUPREME COURT
FILED

JUL 1 1 2007

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice

# EXHIBIT COVER PAGE

| C |
| --- |

EXHIBIT

Description of this Exhibit: Petition For Review

Number of pages to this Exhibit: 31 pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) No. S_____ <br> ) <br> ) Court of Appeal No. H028881 <br> ) |
| Plaintiff and Respondent, | ) <br> ) Monterey County Superior Court <br> ) No. SS032725A |
| v. | ) <br> ) |
| MARIO AVILA, | ) <br> ) <br> ) |
| Defendant and Petitioner. | ) |

# PETITION FOR REVIEW

On Appeal From The Judgment Of The Superior Court
Of The State Of California For The County of Monterey
Honorable Robert F. Moody, Judge

John P. Dwyer, SBN 106860
DWYER & BIGGS LLP
1550 California Street, No. 6-201
San Francisco, CA 94109
415.885.4451

Attorney for Appellant MARIO AVILA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................IV

ISSUES PRESENTED FOR REVIEW........................................................................ 1

REASONS TO GRANT REVIEW............................................................................. 2

STATEMENT OF THE CASE................................................................................... 3

STATEMENT OF FACTS ........................................................................................ 5

I.      Incident 1:  Street Terrorism, Brandishment........................................ 5

II.     Incident 2: Robbery .............................................................................. 6

III.    Incident 3: Shooting ............................................................................. 6

ARGUMENT ........................................................................................................ 7

I.      This Court Should Grant Review Because Trial Counsel
        Provided Ineffective Assistance Of Counsel In (1) Failing
        To Object To The Use Of Petitioner's Juvenile Adjudication
        As A Strike Prior, (2) Failing To Object To Testimony
        That Gang Members Were Outside The Courtroom, and
        (3) Failing To Request An Evidentiary Hearing On Juror
        Bias After Jurors Told The Court They Were Afraid. ....................... 7

        A.      Standard For Ineffectiveness................................................... 7

        B.      Counsel's Failure To Object To The Court's Use Of
                Petitioner's Juvenile Adjudication As A Strike Prior............. 8

        C.      Counsel's Failure To Object To Testimony That
                Gang Members Were Lurking Outside The Courtroom
                During Trial ...................................................................... 13

                1.      Factual Background .................................................. 13

                2.      With A Proper Objection, The Evidence
                        Would Have Been Excluded And A Reasonable
                        Probability Exists That The Jury Would Have
                        Reached A Different Verdict ..................................... 15

        D.      Counsel's Failure To Request A Mistrial Or A
                Hearing To Determine Whether Any Jurors Were
                Biased As A Result Of Their Own Observations
                Of Gang Members.................................................................. 17

II.     This Court Should Grant Review Of The Court Of
        Appeal's Decision To Uphold Admission Of The 911
        Tape, Because That Decision Conflicts With U.S. And
        California Supreme Court Decisions Holding That The

Confrontation Clause Bars Admission Of 911 Statements
Made After The Emergency Has Abated ......................................... 19

    A.    Factual Background ............................................... 20

    B.    The Court Of Appeal Decision ............................................. 20

    C.    The Court Of Appeal's Decision Conflicts With
        U.S. And California Supreme Court Precedent .................... 21

III.    This Court Should Grant Review Because Substantial
    Evidence Does Not Support An Enhancement For Street
    Terrorism In Connection With The Alleged Robbery
    Of Francisco Medina, In Violation Of Federal Due Process ........... 24

    A.    The Court Of Appeal's Review Of The Sufficiency
        Of The Evidence .................................................. 24

    B.    A Reasonable Trier Of Fact Could Not Conclude,
        Based On The Record, That The Robbery Outside
        The Azteca Market Was Gang-Related ............................... 25

CONCLUSION ...................................................................... 28

CERTIFICATE PURSUANT TO CRC RULE 8.504(d)(1) ................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Apprendi v. New Jersey* (2000) 530 U.S. 466 ....................................8, 10-11

*Boyd v. Newland* (9th Cir. 2004) 393 F.3d 1008 ........................................... 8

*Caliendo v. Warden of California Men's Colony*
    (9th Cir. 2004) 365 F.3d 691 ......................................................17-18

*Crawford v. Washington* (2004) 541 U.S. 36 .......................................19-21

*Davis v. Washington* (2005) 126 S.Ct. 547 ........................................2, 20-23

*Davis v. Woodford* (9th Cir. 2004) 384 F.3d 628 ...................................... 25

*In re Derrick B.* (2006) 39 Cal.4th 535 ...................................................... 12

*In re Frank S.* (2006) 141 Cal.App.4th 1192 ............................................. 27

*In re Hamilton* (1999) 20 Cal.4th 273 ...................................................17-18

*In re Jose P.* (2003) 106 Cal.App.4th 458 ................................................. 27

*Jackson v. Virginia* (1979) 443 U.S. 307 .........................................3, 25, 28

*Jones v. United States* (1999) 526 U.S. 227 ..........................................10-11

*Leavitt v. Arave* (9th Cir. 2004) 383 F.3d 809 ........................................... 15

*McKeiver v. Pennsylvania* (1971) 403 U.S. 528 ........................................ 11

*People v. Bowden* (2002) 102 Cal.App.4th 387 ........................................... 9

*People v. Cage* (2007) 40 Cal.4th 965 ...........................................2, 21, 23

*People v. Carter* (2005) 36 Cal.4th 1114 ................................................... 15

*People v. Danks* (2004) 32 Cal.4th 269 ..................................................... 18

*People v. Falsetta* (1999) 21 Cal.4th 903 .................................................. 15

*People v. Ferraez* (2003) 112 Cal.App.4th 925 .....................................27-28

*People v. Gardeley* (1996) 14 Cal.4th 605 ...........................................26-27

*People v. Hannon* (1977) 19 Cal.3d 588 .................................................... 15

*People v. Hedgecock* (1990) 51 Cal.3d 395 ............................................... 18

*People v. Hernandez* (2004) 33 Cal.4th 1040 .......................................7, 25

*People v. Kraft* (2000) 23 Cal.4th 978 ........................................................ 8

*People v. Ledesma* (1987) 43 Cal.3d 171 .................................................... 7

*People v. Lee* (2003) 111 Cal.App.4th 1310 ................................................ 9

*People v. Loeun* (1997) 17 Cal.4th 1 ............................................... 25

*People v. Martinez* (2004) 116 Cal.App.4th 753 ......................................... 26

*People v. Nesler* (1997) 16 Cal.4th 561 ...................................................... 17

*People v. Olguin* (1994) 31 Cal.App.4th 1355 ......................................... 27

*People v. Ortiz* (1997) 57 Cal.App.4th 480 ............................................... 27

*People v. Scott* (1994) 9 Cal.4th 331 ......................................................... 12

*People v. Smith* (2003) 110 Cal.App.4th 1072 ........................................... 9

*People v. Superior Court (Andrades)* (2003) 113 Cal.App.4th 817 ............. 9

*People v. Thimmes* (2006) 138 Cal.App.4th 1207 ..................................... 12

*People v. Wader* (1993) 5 Cal.4th 610 ...................................................... 28

*People v. Waidla* (2000) 22 Cal.4th 690 ................................................... 15

*Remmer v. United States* (1954) 347 U.S. 227 ............................................ 17

*Shepard v. United States* (2005) 544 U.S. 13 ............................................. 11

*Strickland v. Washington* (1984) 466 U.S. 668 ........................................ 7-8

*United States v. Angulo* (9th Cir. 1993) 4 F.3d 843 ................................... 18

*United States v. Blanton* (9th Cir. 2007) 476 F.3d 767 ............................... 8

*United States v. Dutkel* (9th Cir. 1999) 192 F.3d 893 ............................... 18

*United States v. Elias* (9th Cir. 2001) 269 F.3d 1003 ............................... 18

*United States v. Henley* (9th Cir 2001) 238 F.3d 1111 ............................. 18

*United States v. Kortgaard* (9th Cir. 2005) 425 F.3d 602 ........................... 8

*United States v. Rutherford* (9th Cir. 2004) 371 F.3d 634 ......................... 18

*United States v. Tighe* (9th Cir. 2001) 266 F.3d 1187 ............................. 8-9

*United States v. Washington* (9th Cir. 2006) 462 F.3d 1124 ....................... 8

**Constitutions and Statutes**

California Const., art. I, § 15 ....................................................................... 7

U.S. Const., amend. VI .......................................................................... *passim*

Evidence Code § 350 .................................................................................. 15

Evidence Code § 352 .................................................................................. 15

Penal Code § 186.22(a) ............................................................................ 3-4

Penal Code § 186.22(b)(1) .................................................................. 3-4, 25

Penal Code § 186.22(d) ................................................................ 3

Penal Code § 211 ........................................................................ 3

Penal Code § 245(a)(1) ............................................................... 3

Penal Code § 246 ........................................................................ 4

Penal Code § 417(a)(2) ............................................................... 3

Penal Code § 422 ........................................................................ 3

Penal Code § 654 ..................................................................... 4-5

Penal Code § 12022.5(a) .......................................................... 3-4

Welfare & Institutions Code § 707 ........................................... 12

**Other Sources**

Article, *The Constitutional Tension Between Apprendi and McKeiver: Sentence Enhancements Based on Delinquency Convictions and the Quality of Justice in Juvenile Courts* (2003) 38 Wake Forest L. Rev. 1111 .......................................... 10

Article, *The Use of Prior Convictions After Apprendi* (2004) 37 U.C. Davis. L. Rev. 973 ...................................... 10

Article, *"That Isn't Fair, Judge": The Costs of Using Prior Juvenile Delinquency Adjudications in Criminal Court Sentencing* (2004) 40 Hous. L. Rev. 1323 ............................... 10

Comment, *California Three Strikes Law: Should a Juvenile Adjudication Be a Ball or a Strike?* (1995) 32 San Diego L. Rev. 1297 ..................................... 10

Comment, *Juvenile Justice and the Punishment of Recidivists Under California's Three Strikes Law* (2002) 90 Cal. L. Rev. 1157 ................................................ 9

Comment, *Prior "Convictions" Under Apprendi: Why Juvenile Adjudications May Not Be Used to Increase An Offender's Sentence Exposure If They Have Not First Been Proven to a Jury Beyond a Reasonable Doubt* (2004) 87 Marq. L. Rev. 573 ............................................. 10

Note, *But I Was Just a Kid! Does Using Juvenile Adjudications to Enhance Adult Sentences Run Afoul of Apprendi v. New Jersey?* (2005) 26 Cardozo L. Rev. 837 ....................... 10

Note, *Constitutional Law – Right to Jury Trial – Eighth Circuit Holds an Adjudication of Juvenile Delinquency to Be a "Prior Conviction" for the Purposes of Sentence Enhancement at a*

*Subsequent Criminal Proceeding* (2002) 116 Harv. L. Rev. 705 ............9-10

Note, *Juvenile Strikes: Unconstitutional Under Apprendi and Blakely and Incompatible with the Rehabilitative Ideal* (2005) 15 So. Cal. Rev. L. & Women's Stud. 171 ...................................... 10

Note, *The Problem with Forgiving (But Not Entirely Forgetting) the Crimes of Our Nation's Youth: Exploring the Third Circuit's Unconstitutional Use of Nonjury Juvenile Adjudications in Armed Career Criminal Sentencing* (2005) 66 U. Pitt. L. Rev. 887 ...................... 10

Note, *The Use of Juvenile Adjudications Under the Armed Career Criminal Act* (2005) 85 B.U.L. Rev. 263 ...................................... 10

Note, *Should Juvenile Adjudications Count as Prior Convictions for Apprendi Purposes?* (2004) 5 Wm. & Mary L. Rev. 1159 .................. 10

### IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) S_____ |
| Plaintiff and Respondent, | ) ) Court of Appeal No. H028881 |
| v. | ) ) Monterey County Superior Court ) No. SS032725A |
| MARIO AVILA, | ) ) |
| Defendant and Petitioner. | ) ) |

TO THE HONORABLE RONALD GEORGE, CHIEF JUSTICE OF THE STATE OF CALIFORNIA, AND TO THE HONORABLE ASSOCIATE JUSTICES OF THE SUPREME COURT: Pursuant to Rule 8.500 of the California Rules of Court, petitioner Mario Avila seeks review of the Court of Appeal decision in this case, filed on April 17, 2007, and the Court of Appeal order modifying that opinion, filed on May 17, 2007, attached hereto as Exhibits A and B.

### ISSUES PRESENTED FOR REVIEW

I.    Whether the Court of Appeal erred in holding that defense counsel did not provide ineffective assistance of counsel in failing to object to the use of petitioner's juvenile adjudications as strike priors, failing to object to irrelevant and inflammatory evidence of gang members in the courthouse, and failing to request a hearing when jurors express concerns for their own safety.

II.   Whether the Court of Appeal's decision upholding admission of the victim's 911 call, when the victim did not testify and was not unavailable, conflicts with U.S. and California Supreme Court decisions barring such evidence under the confrontation clause of the Sixth Amendment.

III.    Whether the Court of Appeal erred in holding that substantial evidence supported a gang enhancement on petitioner's conviction for robbery as required by federal due process.

## REASONS TO GRANT REVIEW

1.  Defense counsel was ineffective in failing: (1) to object to the use of petitioner's juvenile adjudication as a strike; (2) to object to unfairly prejudicial testimony by the prosecution's gang expert; and (3) to request a mistrial or evidentiary hearing to determine whether the jurors were biased after observing gang members in the courthouse.  The failure to object to the juvenile strike resulted in a doubling of petitioner's sentence.  The failure to object to the gang expert's testimony and to request a mistrial or hearing when jurors told the court they were afraid, resulted in a biased jury that convicted petitioner on the gang enhancement for the robbery even though there was no substantial evidence that the robbery was gang-related.

The juvenile strike issue raises an important issue of law involving a conflict between California Courts of Appeal and the U.S. Court of Appeals for the Ninth Circuit.  The jury bias issues raise important legal issues involving the right to a fair trial.  Accordingly, this Court should grant review to ensure uniformity of decision and to settle an important issue of law. (Cal. Rules of Court, rule 8.500(b)(1).)

2.  Over petitioner's objection on confrontation clause grounds, the trial court admitted a recorded 911 call made by one of the victims, and the Court of Appeal upheld that decision.  Because the statements in the call were "testimonial" – they were made well after the emergency had abated – the Court of Appeal's decision is in conflict with U.S. and California Supreme Court decisions holding that "testimonial" hearsay statements are barred by the confrontation clause of the Sixth Amendment where, as here, the declarant was not subject to cross-examination. (*Davis v. Washington* (2006) 126 S.Ct. 2266; *People v. Cage* (2007) 40 Cal.4th 965.) This Court

should grant review to ensure uniformity of decision. (Cal. Rules of Court, rule 8.500(b)(1).)

3.   The Court of Appeal affirmed a gang enhancement on the robbery count even though the only evidence to support that enhancement was a gang expert's conjectural opinion testimony.   Imposition of that enhancement violated due process. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)   This issue involves an important issue of law for which this Court should grant review. (Cal. Rules of Court, rule 8.500(b)(1).)

## STATEMENT OF THE CASE

On March 17, 2004, petitioner was charged by amended information with crimes arising from three separate incidents:

1.  Street Terrorism and Brandishment, May 22, 2003:

    - Count 3, threats of violence (§ 422)[1] with enhancements for street terrorism (§ 186.22, subd. (b)(1)) and use of a firearm (§ 12022.5, subd. (a));

    - Count 4, street terrorism (§ 186.22, subd. (a)) with an enhancement for use of a firearm (§ 12022.5, subd. (a));

    - Count 5, exhibiting a firearm (§ 417, subd. (a)(2)) with an enhancement for street terrorism (§ 186.22, subd. (d));

2.  Robbery, late July/early August 2003:

    - Count 6, second-degree robbery (§ 211) with an enhancement for street terrorism (§ 186.22, subd. (b)(1));

    - Count 7, assault with a deadly weapon (§ 245, subd. (a)(1)) with an enhancement for street terrorism (§ 186.22, subd. (b)(1));

    - Count 8, street terrorism (§ 186.22, subd. (a)).

3.  Shooting, September 1, 2003:

---

[1] All statutory citations are to the Penal Code unless otherwise indicated.

- Count 1, shooting at an occupied vehicle (§ 246) with an enhancement for street terrorism (§ 186.22, subd. (b)(1));
- Count 2, street terrorism (§ 186.22, subd. (a)) with an enhancement for use of a firearm (§ 12022.5, subd. (a));

The information also alleged a prior juvenile conviction for robbery. (1 CT 266-272.)[2] Count 3 was not submitted to the jury.

Outside the presence of the jury, petitioner admitted as a strike prior a juvenile adjudication for robbery. (5 RT 1003-1004.) The jury then returned verdicts finding petitioner guilty of all remaining counts and finding true all enhancements. (2 CT 387-393; 5 RT 1005-1011.)

On May 12, 2005, the trial court sentenced petitioner to an aggregate term of 17 years and 4 months to be followed by a sentence of 30 years to life, as follows:

- Count 6: 3 years (middle term), doubled to six years for the juvenile strike, plus 10 years for the street terrorism enhancement;
- Count 4: 8 months (1/3 of the middle term), doubled to sixteen months for the juvenile strike, to be served consecutively to Count 6;
- Count 5: 3 years (middle term), doubled to six years for the juvenile strike stayed under section 654; to be served concurrent with Counts 6 and 4;
- Count 7: 4 years (upper term), doubled to 8 years for the juvenile strike, plus 5 years for the street terrorism enhancement; stayed under section 654; to be served concurrent with Counts 6, 5, and 4;
- Count 8: 3 years (upper term), doubled to six years for the

---

[2] "CT" refers to the Clerk's Transcript; "RT" refers to the Reporter's Transcript.

juvenile strike; stayed under section 654;

- Count 1 (shooting at an occupied vehicle): 15 years to life, doubled to 30 years to life for the juvenile strike; to be served consecutive to Counts 4, 5, 6, 7, and 8; and
- Count 2: 3 years (upper term), doubled to six years for the juvenile strike; stayed under section 654.

(2 CT 432-433, 435-438; 6 RT 1254-1259.)

Petitioner appealed, contending, inter alia, that (1) the gang enhancement finding for the robbery conviction violated due process because it was not supported by substantial evidence; (2) his defense counsel was ineffective, in violation of the state and federal constitutions, for (a) failing to object to the use of petitioner's juvenile adjudication as a strike prior, (b) failing to object to irrelevant and inflammatory testimony about gang members in the courthouse, and (c) failing to request a hearing on possible juror bias and misconduct after jurors expressed fear of retaliation from gang members; and (3) admission of the 911 call violated his right under the confrontation clause of the Sixth Amendment.

In an unpublished opinion, the Court of Appeal affirmed petitioner's convictions and sentence in their entirety, rejecting each of these arguments. (See Exhibit A.) Following a timely petition for rehearing, the Court of Appeal modified its opinion in significant respects, denied the petition for rehearing, and did not modify the judgment. (See Exhibit B.)

### STATEMENT OF FACTS

Petitioner's conviction stems from three separate incidents that occurred in Salinas, California between May and September 2003.

### I.  Incident 1: Street Terrorism, Brandishment.

On May 22, 2003, petitioner, along with Juan "Chucky" Ortiz and two unnamed women, verbally accosted Jorge Soto, his wife Sharon

Martinez, his daughter Kelli,[3] and a friend. (2 RT 319-321.) Petitioner and Ortiz yelled "Norte" at Soto, and the women yelled "Bitch Norte" at Martinez. (2 RT 323, 326-327.) Petitioner and two others wore red clothing, and all four "threw" gang signs. (2 RT 323-325, 327; 3 RT 543.) In addition, petitioner displayed a gun tucked into his waistband. (2 RT 327-329.) Petitioner told Soto that he would "get ahold of" him one day, and, as he was leaving, told Ortiz "We're going to get him [i.e., Soto] later." (2 RT 327-328.) Soto and Kelli later identified petitioner from a photo array. (3 RT 556-557, 596-598.)

## II.    Incident 2: Robbery.

One evening, near the end of July 2003, petitioner and two other men accosted Francisco Medina outside the Azteca Market. The men demanded Medina's wallet and attacked him when he refused to hand it over. They hit Medina in the face, kicked him repeatedly, and, while petitioner held him in a bear hug, another assailant stabbed him in the back with a broken piece of glass. After the assault, the men fled the scene with Medina's wallet. (2 RT 289-294.) Medina did not report the incident until after the September shooting incident (*infra*), telling police at that time that petitioner was involved in both incidents. (2 RT 297; 3 RT 664-665.)

## III.   Incident 3: Shooting.

On September 1 2003, Soto, Martinez, Kelli, her friend Paige, Medina, and another person drove past the house of a known Norteños gang member. (2 RT 269-271, 333-335; 3 RT 509-511, 527-529, 621-622.) Petitioner was in the front yard of the house along with several other people, some of whom wore red clothing. (2 RT 273-274, 279; 3 RT 529-530.)

---

[3] Because Kelli was 17 at the time of trial (3 RT 527), only her first name is used in this petition.

As the car drove by, Manuel Baeza threw bottle, hitting the car. (2 RT 281-282; 3 RT 533-534.) About the same time, a car pulled into the road in front of the victims' car, blocking their way forward. (2 RT 280-281.) The victims drove around the car, and turned at the corner. (2 RT 281-283.) Petitioner then emerged from the house and ran towards the victims' car while carrying a handgun. (2 RT 284-286, 310-312, 341-342.) Petitioner fired twice at the car, hitting it once. (2 RT 376-377; 3 RT 663-664.)

The victims immediately drove to a police station, where Martinez called 911 from a phone in the lobby, reporting both the shooting and various prior incidents. (See 2 CT 485.) Medina and Soto later identified petitioner as the shooter. (2 RT 288, 330-331, 343-344; 3 RT 572.)

### ARGUMENT

I.    **This Court Should Grant Review Because Trial Counsel Provided Ineffective Assistance Of Counsel In (1) Failing To Object To The Use Of Petitioner's Juvenile Adjudication As A Strike Prior, (2) Failing To Object To Testimony That Gang Members Were Outside The Courtroom, and (3) Failing To Request An Evidentiary Hearing On Juror Bias After Jurors Told The Court They Were Afraid.**

Defense trial counsel rendered ineffective assistance of counsel, in violation of the California and federal constitutions, by failing to object on three separate issues. (U.S. Const., amend. VI; Cal. Const. art. I, § 15; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.)

### A.    **Standard For Ineffectiveness.**

The standards for ineffective assistance are well established: first, petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and second, petitioner must establish a reasonable probability that the verdict would have been more favorable to him absent trial counsel's error. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1052-1053; *Strickland v.*

*Washington* (1984) 466 U.S. 668, 687.)  An ineffectiveness claim may be raised on appeal, even if the record fails to show why counsel failed to act, if there can be no satisfactory explanation for counsel's inaction. (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.)

### B.    Counsel's Failure To Object To The Court's Use Of Petitioner's Juvenile Adjudication As A Strike Prior.

While the jury was deliberating, petitioner admitted a strike prior based on a juvenile adjudication for robbery. (5 RT 1003-1004.)  Based on that strike prior, the trial court doubled petitioner's sentence for each offense. (2 CT 432-433.)

On appeal, petitioner argued that counsel was ineffective by failing to object to use of his juvenile adjudication as a strike.  Ninth Circuit precedent holds that basing petitioner's sentence on a prior juvenile adjudication that was neither admitted nor determined by a jury violates the Sixth Amendment.  (*United States v. Tighe* (9th Cir. 2001) 266 F.3d 1187, 1194; *Boyd v. Newland* (9th Cir. 2004) 393 F.3d 1008, 1016-1017; *United States v. Kortgaard* (9th Cir. 2005) 425 F.3d 602, 609-610; *United States v. Washington* (9th Cir. 2006) 462 F.3d 1124, 1142; *United States v. Blanton* (9th Cir. 2007) 476 F.3d 767, 769.)  These cases base their reasoning on *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, which holds that a jury rather than a judge must find every fact that increases a sentence beyond that authorized by the verdict.  In California, juvenile adjudications are decided by the court, not by a jury.  Thus, under *Apprendi,* the underlying juvenile offense may not be used as the basis to increase petitioner's sentence.

Although the Court of Appeal agreed that "[t]he use of juvenile priors in adult sentencings is very much in controversy at the present," it rejected petitioner's claim, holding that defense counsel's decision not to challenge the juvenile strike prior was "not unreasonable" because, "[g]iven

the unsettled state of the law and the absence of controlling United States Supreme Court precedent, counsel was justified in concluding there was no reasonable likelihood of success." (Order at p. 3.) That conclusion was erroneous.

Although the California courts of appeal since *Bowden* have generally accepted the use of juvenile adjudications as strike priors (see *People v. Bowden* (2002) 102 Cal.App.4th 387, 393-394; *People v. Smith* (2003) 110 Cal.App.4th 1072, 1077-1078; *People v. Superior Court (Andrades)* (2003) 113 Cal.App.4th 817, 830-834; *People v. Lee* (2003) 111 Cal.App.4th 1310, 1312-1316), those decisions have included vigorous dissents mirroring *Tighe*'s reading of *Apprendi*. (See, e.g., *People v. Lee, supra,* 111 Cal.App.4th at pp. 1319-1323; *People v. Smith, supra,* 110 Cal.App.4th at pp. 1082-1108.) Indeed, in *Smith,* even the *majority* registered disquiet with its holding, pointing to

> the seeming injustice in classifying delinquency proceedings as something other than "criminal" trials for purposes of determining the offender's right to a jury trial while also permitting the resulting declaration of wardship to be used as a prior felony conviction for purposes of sentence enhancement if the juvenile reoffends as an adult.

(110 Cal.App.4th at p. 1081.)[4] Significantly, commentators are virtually unanimous that *Apprendi* bars the use of juvenile convictions to enhance adult sentences.[5] The U.S. Supreme Court has emphasized that the Sixth

---

[4] The *Smith* majority further noted that this "sense of fundamental unfairness is all the more notable" since the prosecutor may dictate whether to proceed against an accused minor in juvenile court, thereby dictating whether the minor is entitled to a jury trial, and yet "remains free under the current version of the Three Strikes law to have the juvenile offense treated with the identical consequences as an adult conviction." (*Id.*)

[5] See, e.g., Comment, *Juvenile Justice and the Punishment of Recidivists Under California's Three Strikes Law* (2002) 90 Cal. L. Rev. 1157; Note, Recent Cases, *Constitutional Law – Right to Jury Trial – Eighth Circuit*

Amendment jury trial right, rather than being a minor or formalistic requirement to be lightly disregarded, retains a vital role to protect civil and political liberties and guard "against the spirit of oppression." (*Apprendi, supra,* 530 U.S. at p. 477.)

Excepted from the *Apprendi* rule is the fact of a "prior *conviction.*" (*Jones v. United States* (1999) 526 U.S. 227, 243, fn. 6, emphasis added; *Apprendi, supra,* 530 U.S. at p. 476.) A bench finding that a defendant was previously convicted does not violate the jury requirement because *a jury*

---

*Holds An Adjudication of Juvenile Delinquency to Be a "Prior Conviction" for the Purpose of Sentence Enhancement at a Subsequent Criminal Proceeding – United States v. Smalley, 294 F.3d 1030 (8th Cir. 2002)* (2002) 116 Harv. L. Rev. 705; Article, *The Constitutional Tension Between Apprendi and McKeiver: Sentence Enhancements Based on Delinquency Convictions and the Quality of Justice in Juvenile Courts* (2003) 38 Wake Forest L. Rev. 1111; Comment, *California Three Strikes Law: Should a Juvenile Adjudication Be a Ball or a Strike?* (1995) 32 San Diego L. Rev. 1297; Comment, *Prior "Convictions" Under Apprendi: Why Juvenile Adjudications May Not Be Used to Increase An Offender's Sentence Exposure If They Have Not First Been Proven to a Jury Beyond a Reasonable Doubt* (2004) 87 Marq. L. Rev. 573; Article, *The Use of Prior Convictions After Apprendi* (2004) 37 U.C. Davis. L. Rev. 973; Article, *"That Isn't Fair, Judge": The Costs of Using Prior Juvenile Delinquency Adjudications in Criminal Court Sentencing* (2004) 40 Hous. L. Rev. 1323; Note, *Juvenile Strikes: Unconstitutional Under Apprendi and Blakely and Incompatible with the Rehabilitative Ideal,* (2005) 15 So. Cal. Rev. L. & Women's Stud. 171; Note, *Should Juvenile Adjudications Count as Prior Convictions for Apprendi Purposes?* (2004) 5 Wm. & Mary L. Rev. 1159; Note, *But I Was Just a Kid! Does Using Juvenile Adjudications to Enhance Adult Sentences Run Afoul of Apprendi v. New Jersey?* (2005) 26 Cardozo L. Rev. 837; Note, *The Use of Juvenile Adjudications Under the Armed Career Criminal Act* (2005) 85 B.U.L. Rev. 263; Note, *The Problem with Forgiving (But Not Entirely Forgetting) the Crimes of Our Nation's Youth: Exploring the Third Circuit's Unconstitutional Use of Nonjury Juvenile Adjudications in Armed Career Criminal Sentencing* (2005) 66 U. Pitt. L. Rev. 887.

returned that prior conviction.[6]  However, because juvenile proceedings in California do not constitutionally require jury trials, prior juvenile "adjudications" are *not* the same as "prior convictions." (See *McKeiver v. Pennsylvania* (1971) 403 U.S. 528.)  The constitutional defect in using a juvenile adjudication as a strike to enhance an adult sentence, therefore, is that *no jury ever determined the facts underlying the juvenile adjudication and therefore the sentence-enhancing strike.* (*Jones, supra,* 526 U.S. at p. 249 [justifying the exception for prior *convictions* by holding that "a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, *and jury trial* guarantees"], emphasis added.)  Using a non-jury juvenile adjudication as a strike defeats the constitutional "guarantee [that] a jury stand[] between a defendant and the power of the state." (*Shepard v. United States* (2005) 544 U.S. 13, 25 [plurality opn].)  Although the state may have a valid interest in using juvenile adjudications to enhance adult sentences, that interest – however strong – cannot justify constitutional shortcuts. (*Apprendi, supra,* 530 U.S. at p. 475.)

In sum, the distinction between a juvenile adjudication and a conviction remains profound:

> there is a vast difference between accepting the validity of a *prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial* and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.

(*Apprendi, supra,* 530 U.S. at p. 496, emphasis added.)  Although the state is not compelled to provide juvenile offenders with the right to a jury trial, if it wants to use the resulting adjudication at a later date to enhance a

---

[6] Unless, of course, the defendant waived his Sixth Amendment right to a jury trial on that prior case and either admitted his guilt or had a judge trial.

sentence for a subsequent conviction it must provide that right – either by making a jury trial available as part of the juvenile adjudicatory process, or by trying the juvenile as an adult. Significantly, where the state *wants* to punish a juvenile offender with a "conviction," rather than reform him with an "adjudication," it *can do so* by prosecuting him as an adult in criminal court. (See, e.g., Welf. & Inst. Code § 707.)[7]

For all these reasons, then, there was a reasonable probability of a different outcome – *even if only on appeal* – had counsel objected to the juvenile strike. (See *People v. Scott* (1994) 9 Cal.4th 331, 351 [defense attorney who does not perform reasonably *at sentencing* is subject to a finding of ineffectiveness]; see also *People v. Thimmes* (2006) 138 Cal.App.4th 1207, 1212-1213.) [failure to understand, pursue, and seek the most advantageous sentencing alternative constitutes ineffective assistance of counsel].) Here, counsel failed to recognize that "[t]he use of juvenile priors in adult sentencings is very much in controversy at the present,"

---

[7] Traditionally the juvenile adjudicatory system has promoted reform rather than punishment. (Cf. *In re Derrick B.* (2006) 39 Cal.4th 535, 540 ["'Conviction' and 'sentencing' are terms of art usually associated with adult proceedings."].) As Justice White explained in a concurring opinion:

> [R]eprehensible acts by juveniles are not deemed the consequence of mature and malevolent choice but of environmental pressures (or lack of them) or of other forces beyond their control. Hence the legislative judgment not to stigmatize the juvenile delinquent by branding him a criminal; his conduct is not deemed so blameworthy that punishment is required to deter him or others. Coercive measures, where employed, are considered neither retribution nor punishment. Supervision or confinement is aimed at rehabilitation, not at convincing the juvenile of his error simply by imposing pains and penalties. . . . Against this background and in light of the distinctive purpose of requiring juries in criminal cases, I am satisfied with the Court's holding.

(*Id.* at pp. 551-552.)

(Order at p. 3) and that an objection was essential, if only to preserve the issue for appeal. Because counsel had no plausible tactical reason for failing to object to the juvenile adjudication as a strike prior, his failure to object constituted ineffective assistance.

### C.    Counsel's Failure To Object To Testimony That Gang Members Were Lurking Outside The Courtroom During Trial.

The government's dominant theme at petitioner's trial was the threat posed to the community by Norteños gang members. Consequently, it introduced irrelevant and prejudicial testimony from its gang expert that gang members were lurking outside the courtroom with cell-phone cameras. This testimony stoked jurors' concerns about their safety, prompting them to send a note to the judge seeking police protection. One juror even sought – and obtained – an order to be excused from the jury based on her fear engendered by the expert's testimony.

Trial counsel, however, did not object to admission of the gang expert's testimony.

### 1.    Factual Background.

Beginning in the voir dire and throughout the trial, the court referred to jurors only by their juror numbers. (2 CT 376-377; 1 RT 4-5, 7-8.) In doing so, the trial court signaled to the jury that their safety depended, in some measure, upon remaining anonymous. Although that particular ruling was not challenged on appeal, it helps explain the context in which the jurors were rendered susceptible to inflammatory and irrelevant evidence about gang members lurking outside the courtroom.

The prosecution's gang expert, Officer Burnett, testified extensively about the Norteños gang and its prison origins. (3 RT 690-692.) Burnett told the jury that Norteños members "commit murders, robberies, assault with deadly weapon [sic], shooting [sic], carjackings, and a list of crimes."

(3 RT 692.)  She stated that "well over 1,000 Norteños gang members" were in the Salinas area (3 RT 693), and suggested that they commonly use "intimidation . . . against witnesses and victims."  (3 RT 696.)  She described numerous predicate crimes (3 RT 697-702, 709-710) – far more than was required to prove the necessary elements. (3 RT 710-735)  She also provided extensive evidence of petitioner's gang membership even though counsel acknowledged that fact during voir dire.  She then returned to her main theme of gang intimidation, explaining that gang members intimidate local residents and store owners to dissuade them from reporting their crimes (3 RT 736-737), and specifically target witnesses for intimidation.  (3 RT 737.)  Immediately thereafter, Officer Burnett, prompted by the prosecutor, strongly suggested to the jurors that Norteños gang members were systematically engaged in intimidation in this very trial, stating that she had seen several Norteños gang members and a "high status" Nuestra Familia gang member in the hallway outside the courtroom, that they were "watching" this trial, that some gang members were "roaming the hallways" with no apparent purpose, and that some had cell phones with which they "could take pictures of the witnesses or the victim." (3 RT 737-739.)

Trial counsel did not object.  The jurors then sent the court a note (written by the bailiff) stating that they had "observed gang members within the building and in the court room," expressing concerns about "potentially being photographed by gang members with cell phones," and telling the court that they "park far away from the court house and might be harassed by gang members as [they] go to and from their vehicles." (2 CT 546.)  The court promptly ordered a bus to take the jurors to their cars. (2 CT 546; 3 RT 779, 796.)

The next morning, Juror No. 1 told the trial court in chambers that Burnett's testimony "doesn't make me feel safe."  (2 CT 547; 4 RT 796.)

She added that she was "very scared" and "when the police have to take us to the – to our cars, that makes me feel worse." (4 RT 796.) After the juror said her fear for herself and her family would prevent her from being able to reach a decision in the case, the court excused her for cause. (4 RT 796-798.) The court thereafter admonished the jurors that although the court had arranged for a bus in response to some jurors' concerns, this did not mean they faced any danger. (4 RT 799, 800-801.)

> ## 2. With A Proper Objection, The Evidence Would Have Been Excluded And A Reasonable Probability Exists That The Jury Would Have Reached A Different Verdict.

Officer Burnett's testimony about gang members in the courthouse had no legitimate bearing on the offenses charged, but rather "uniquely tend[ed] to evoke an emotional bias against" petitioner. (*People v. Carter* (2005) 36 Cal.4th 1114, 1168.) Consequently, with a proper objection the evidence would have been excluded as irrelevant and unduly prejudicial. (Evid. Code, §§ 350, 352; see also *People v. Waidla* (2000) 22 Cal.4th 690, 724 [court must exclude evidence that "poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome.") Both state and federal due process require the exclusion of evidence that is "so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913; *Leavitt v. Arave* (9th Cir. 2004) 383 F.3d 809, 829.)

Burnett's testimony had little or no probative value. Most significantly, the prosecution offered no evidence to conclude that petitioner was in any way aware of, or responsible for, the presence of gang members in the courthouse. (See *People v. Hannon* (1977) 19 Cal.3d 588, 600 [admission of evidence that a defense witness was instructed not to speak with the prosecution "is erroneous absent the prerequisite of proof that the defendant was present at such an incident"].) Further, if offered to

prove petitioner was a gang member the testimony was cumulative because defense counsel expressly acknowledged petitioner's gang membership during voir dire. (1 RT 111.) Nor did it tend to prove any disputed element of any of the crimes or enhancements, i.e., that the robbery outside the Azteca Market was gang-related. In sum, the prosecution's case was not *legitimately* rendered stronger because of this testimony.

By causing the jurors to fear for their own safety, however, Burnett's testimony created a substantial danger of undue prejudice and emotional bias against petitioner, rendering the trial fundamentally unfair. Before the evidence was complete, the jurors had become pre-disposed to find that petitioner was a dangerous person from whom they needed protection.

No plausible tactical reason exists for defense counsel's failure to object. The evidence did not support any conceivable defense theory, and the objection could have been raised at sidebar.

The trial court's admonition was irrelevant and inadequate. First, the court did not instruct the jurors to disregard the portion of Burnett's testimony about gang members outside the courtroom. Thus, under the court's instructions, the jurors were entitled to rely on this irrelevant and inflammatory testimony to convict petitioner.

Second, the admonition did nothing to address the jurors' concerns that gang members might photograph them for retaliation, nor did it instruct jurors that petitioner was not responsible for the presence of the gang members. Rather, by focusing entirely on the bus transportation, and stating that the jurors' safety was not jeopardized (which was implausible given Burnett's testimony), the court failed to address that Burnett's inflammatory testimony deprived petitioner of a fair trial, and failed to keep the jurors focused on the task at hand – applying relevant evidence to the appropriate charges.

There is a reasonable probability of a different outcome on gang enhancement had the evidence about gang members roaming the halls outside the courtroom been excluded.   The prosecution submitted no evidence (other than Burnett's unsupported opinion testimony) that the robbery outside the Azteca Market was gang-related, and the only percipient witness gave no evidence that the robbers used gang signs, wore gang colors or uttered gang expressions, not otherwise identified themselves as gang members.

> **D.    Counsel's Failure To Request A Mistrial Or A Hearing To Determine Whether Any Jurors Were Biased As A Result Of Their Own Observations Of Gang Members.**

The jurors were deeply affected by *their own independent* observations of gang members in the courtroom and in the hallway outside the courtroom.  (See 2 CT 546; 4 RT 796-798.)  Trial counsel should have moved for a mistrial or at least requested a hearing to determine whether the jurors had become biased as a result.   Counsel's failure to do so constituted ineffective assistance of counsel.

Under both California and federal constitutional law, "the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias." (*People v. Nesler* (19970 16 Cal.4th 561, 578; *Remmer v. United States* (1954) 347 U.S. 227, 229 [any "private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending before the jury" is "presumptively prejudicial"].)  All contact that is more than incidental or de minimis creates such a presumption.  (*Caliendo v. Warden of California Men's Colony* (9th Cir. 2004) 365 F.3d 691, 696-697.)  The conviction must be reversed if the government fails to rebut the presumption. (*In re Hamilton,*

(1999) 20 Cal.4th 273, 295-296; *People v. Danks* (2004) 32 Cal.4th 269, 303; *United States v. Rutherford* (9th Cir. 2004) 371 F.3d 634, 641.)

Under both California and federal law, a defendant alleging juror misconduct is entitled to an evidentiary hearing if he demonstrates "a strong possibility that prejudicial misconduct occurred" and a hearing is necessary to resolve a "material conflict." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419; (*Caliendo, supra*, 365 F.3d at pp. 697-698; *United States v. Angulo* (9th Cir. 1993) 4 F.3d 843, 846-847 [anonymous, threatening phone call to juror created a presumption of prejudice]; *United States v. Henley* (9th Cir. 2001) 238 F.3d 1111, 1116-1117 [contact that frightened a juror created a presumption of prejudice]; *United States v. Elias* (9th Cir. 2001) 269 F.3d 1003, 1021 [focusing on whether the defendant's contact with a juror "preoccup[ied the jurors] at the time, frighten[ed] them, or distract[ed] them from focusing on the evidence"]; (*United States v. Dutkel* (9th Cir. 1999) 192 F.3d 893, 897 [court must consider "whether the intervention interfered with the jury's deliberations by distracting one or more of the jurors, or by introducing some other extraneous factor in to the deliberative process"].)

Here, the jurors said that they had seen gang members in the courthouse, and were afraid of being photographed and harassed. (2 C.T. p. 546.) Juror No. 1 was so frightened she had to be excused. (4 RT 796-798.) Further, it appears that the bailiff spoke to the jurors about gang members in the courthouse. (See CT 546 ["I explained to the jurors that anyone caught photographing or harassing a juror would be immediately arrested."].)

A hearing was therefore required to establish numerous material facts, including (1) exactly what the jurors observed in the courtroom or in the rest of the courthouse, and over what period of time; (2) what, if anything, the jurors overheard gang members say; (3) what, if anything, the

jurors overheard other persons say about the gang members in the courthouse; (4) what the bailiff or other court officers said to the jurors about gang members in the courthouse; (5) what, if anything, the jurors said to each other, outside the context of deliberations, about the gang members; and (6) how many jurors heard or observed any of the foregoing statements or conduct.

Nonetheless, trial counsel did not seek a mistrial or ask for an evidentiary hearing. No plausible tactical reason exists for defense counsel not doing so. This is not a case in which moving for mistrial or seeking a hearing was demonstrably futile. Nor was there any advantage to petitioner in foregoing a hearing during the trial. In fact, counsel could have sought a hearing as part of a motion for a new trial.

As described above, other than Burnett's unsupported conjectures, the prosecution produced no evidence that the robbery outside the Azteca Market was gang-related. Furthermore, the available record demonstrates that the jurors were scared by the presence of gang members over the course of several days, thereby creating a serious danger they were distracted and prejudiced against petitioner. On this record, there is a reasonable probability that the jury would have reached a different result.

**II.    This Court Should Grant Review Of The Court Of Appeal's Decision To Uphold Admission Of The 911 Tape, Because That Decision Conflicts With U.S. And California Supreme Court Decisions Holding That The Confrontation Clause Bars Admission Of 911 Statements Made After The Emergency Has Abated.**

The trial court admitted a tape-recorded 911-call, made some time after the September 1 shooting incident, over petitioner's objection that its admission would violate the confrontation clause of the Sixth Amendment as set forth in *Crawford v. Washington* (2004) 541 U.S. 36. (See 1 CT 278;

3 RT 681.) The speaker on the tape, Martinez, did not testify at trial and was never subjected to cross-examination at any point in the proceedings.[8]

### A.    Factual Background.

Following the September 1 shooting, Martinez drove the victims to a police station some 10-15 minutes away, where she called 911 from the lobby phone. (See 2 CT 485.)

In response to the 911 operator's questions, Martinez described both the shooting and the robbery of Medina outside the Azteca Market a month earlier, even though she was not a percipient witness to that robbery. She implicated petitioner in the shooting incident, the Azteca Market robbery (see 2 CT 485 ["they stabbed the son with the beer bottle, now they're shooting as us"]), another uncharged robbery, and robberies in general, that she also did not witness. (2 CT 485 ["They hang out and they rob people"].) Her statements on the 911 tape played a central role in proving the gang-enhancement for the Medina robbery.

### B.    The Court Of Appeal Decision.

On appeal, petitioner argued that admitting the tape violated the confrontation clause as interpreted in *Crawford* and *Davis v. Washington* (2006) 126 S.Ct. 2266.

In its modified opinion, filed after the petition for rehearing, the Court of Appeal held that the confrontation clause did not require exclusion of Martinez's statements to the 911 operator. It reasoned, in agreement with the trial court, that the statements were "made for the purpose of obtaining assistance during an ongoing emergency." (Order at p. 2.) The Court emphasized that Martinez's statements were not made in response to

---

[8] On appeal, respondent acknowledged that petitioner had no opportunity – either before or during the trial – to cross-examine Martinez regarding her statements on the 911 tape. Respondent also did not dispute that the prosecution failed to show that Martinez was unavailable to testify at trial.

-20-

structured police questioning, and also that she was agitated and fearful when making them.  (*Id.* at p. 3.)

The court concluded that in these circumstances Martinez's statements were non-testimonial: "Clearly, Martinez was reporting a crime and seeking help, and the operator was trying to get enough information from her for police to assist her."  (*Ibid.*)

### C.    The Court Of Appeal's Decision Conflicts With U.S. And California Supreme Court Precedent.

Whether admission of Martinez's statements in the 911 call violated the confrontation clause turns on whether those statements were "testimonial."  The Court of Appeal decision, holding that all of Martinez's statements on the tape were non-testimonial, conflicts with U.S. and California Supreme Court precedent.  (See *Davis v. Washington* (2006) 126 S.Ct. 2266; *People v. Cage* (2007) 40 Cal.4th 965.)

The Sixth Amendment right to confront witnesses bars the admission of testimonial hearsay from a witness who is unavailable to testify at trial unless the defense had a prior opportunity to cross-examine the witness.  (*Crawford, supra,* 541 U.S. at pp. 68-69.)  Admissibility of the statements under state evidentiary rules, such as exceptions to the hearsay rule, has no bearing on the confrontation clause issue.  (*Id.* at pp. 50-51, 56 fn. 7, 61; *People v. Cage, supra,* 40 Cal.4th at pp. 978-979.)

As this Court recently noted in *Cage*, the U.S. Supreme Court's recent decision in *Davis v. Washington* provides extensive guidance about the distinction between testimonial and non-testimonial statements.  The key to the distinction, in the context of a 911 call, is that only those statements reporting an "ongoing" emergency are non-testimonial:

> Statements are nontestimonial when made in the course of police interrogation *under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.*

> They are testimonial when the circumstances objectively
> indicate that there is no such ongoing emergency, and that the
> primary purpose of the interrogation is to establish or prove
> past events potentially relevant to later criminal prosecution.

(*Davis*, 126 S.Ct. at pp. 2273-2274, emphasis added.)

In *Davis v. Washington*, for example, the Court found that the statements made at the beginning of the 911 call, during an ongoing domestic violence assault, were non-testimonial. (126 S.Ct. at p. 2271 [stating that "He's here jumpin' on me again. . . . He's usin' his fists."].) The Court found those statements were "plainly a call for help against bona fide physical threat" in which the caller "was speaking about events *as they were actually happening*, rather than 'describing past events.'" (*Id.* at p. 2276, emphasis in original.)

By contrast, the Court found that other statements, made by the same caller, *on the same call*, but *after* the husband had left the home and the emergency had abated, were testimonial rather than non-testimonial, and therefore fully subject to the Sixth Amendment's confrontation clause. (*Id.* at p. 2277.)

Here, the circumstances at the time Martinez made the 911 call did not "objectively indicate" an ongoing emergency requiring immediate resolution. Martinez made the 911 call some 10-15 minutes *after* the attack was over, from the safety of a police station a considerable distance away (i.e., approximately 10-15 minutes away by car). The primary purpose of those statements, therefore, was *not* "to enable police assistance to meet an ongoing emergency" But, rather, to help the police investigate the case and arrest the perpetrators. (See 2 CT 483:21, 485:10-11.)

Even more on point is the companion case to *Davis* – *Hammon v. Indiana* – which, like *Davis*, involved domestic violence, but which, unlike *Davis*, involved "no immediate threat to" the defendant's wife at the time she made her statements to the police. (126 S.Ct. at p. 2278; see also *ibid.*

-22-

[when the police arrived, they "heard no arguments or crashing and saw no one throw or break anything."].)    The Court held that because the statements were made shortly *after* the emergency had abated, they were not about "'what is happening,' but rather 'what happened.'" (*Ibid.*) Even though the Court agreed that the defendant's wife was "somewhat frightened," it found her statements to be testimonial rather than non-testimonial, and therefore subject to the requirements of the Sixth Amendment confrontation clause.

By the same token, because Martinez made her statements on the 911 tape only *after* she had driven away from the scene of the danger and found sanctuary in a police station, there is no objective evidence that her statements were made under an "immediate threat." (See *People v. Cage*, *supra*, 40 Cal.4th at p. 985 [holding the statements were testimonial because they were make in response to questions asked after the assault was over, when the victim and perpetrator were geographically separated, and when the victim was in no further danger of violence].)  As in *Hammon* and *Cage*, therefore, Martinez's statements were testimonial rather than non-testimonial.

The Court of Appeal's decision conflicts with established precedent in several respects. *First*, the court relied on the nature of the questioning. (Order at p. 3), whereas, in *Davis*, the Supreme Court explained that it was the nature of the *statements* rather than the nature (or even existence) of the questioning that determines whether or not the statements are testimonial. (See 126 S.Ct. at p. 2274, fn. 1.)

*Second*, the Court improperly focused on Martinez's subjective condition – i.e., that she was fearful and agitated, and that she did not expect her statements would be used to convict the perpetrator – rather than the objective circumstances in which her statements were made – such as the fact the call's purpose was to establish past facts and investigate and

possibly prosecute the perpetrator. For example, Martinez's statements that petitioner had been involved in a robbery a month earlier and had committed another uncharged robbery, were designed, not to obtain assistance for an ongoing emergency, but rather to identify the perpetrator and bring a criminal case against him.

*Third*, by holding *all* the statements on the tape admissible, the Court of Appeal disregarded the Supreme Court's admonition that even if some statements were non-testimonial, testimonial statements in the same conversation must be redacted. The Supreme Court made clear that even a conversation that *begins* with non-testimonial statements may evolve into one with testimonial statements that are subject to the confrontation clause. (126 S.Ct. at p. 2277 ["This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it, 'evolve into testimonial statements,' 829 N.E.2d, at 457, once . . . the emergency appears to have ended."].) The Court also made clear that if a tape contains both testimonial and non-testimonial statements, the trial court should order it redacted to exclude the testimonial statements. (*Ibid.*)

**III.    This Court Should Grant Review Because Substantial Evidence Does Not Support An Enhancement For Street Terrorism In Connection With The Alleged Robbery Of Francisco Medina, In Violation Of Federal Due Process.**

The record on appeal does not contain substantial evidence from which a rational trier of fact could find that the robbery of Francisco Medina outside the Azteca Market was gang-related.

**A.    The Court Of Appeal's Review Of The Sufficiency Of The Evidence.**

The Court of Appeal's conclusion that there was substantial evidence to support the gang enhancement was based on the following: (1) evidence that petitioner was a gang member; (2) evidence that petitioner

committed the robbery with another gang member; and (3) opinion testimony from a gang expert (who was not a percipient witness to any aspect of the robbery) that robbery can benefit a gang. (Slip opn. at pp. 11-12.) The Court also pointed to testimony by the gang expert that she had seen gang members in the courthouse with "cell phones which were capable of taking pictures of potential witnesses in an effort to intimidate them." (Order at p. 1.)

### B. A Reasonable Trier Of Fact Could Not Conclude, Based On The Record, That The Robbery Outside The Azteca Market Was Gang-Related.

Federal due process requires that the appellate court determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [emphasis in original]; *Davis v. Woodford* (9th Cir. 2004) 384 F.3d 628, 639 [same].) The Court of Appeal's decision upholding the gang enhancement violated this standard.

A street terrorism enhancement for a robbery requires proof that the robbery was committed "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1); *People v. Hernandez* (2004) 33 Cal.4th 1040, 1047.)[9] There must also be proof that the robbery was committed with the "specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1); *People v. Loeun* (1997) 17 Cal.4th 1, 11.) Gang membership alone is not sufficient to prove a street terrorism enhancement. (*People v.*

---

[9] Section 186.22, subdivision (b)(1), prescribes consecutive punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony."

*Gardeley* (1996) 14 Cal.4th 605, 623-624); *People v. Martinez* (2004) 116 Cal.App.4th 753, 762.)

Here, the victim of the robbery, Medina, testified that petitioner and two other individuals demanded his wallet and then took it by force after stabbing him in the back with a piece of glass.  (2 RT 291-294.)  Medina did not report that his assailants wore gang colors, threw gang signs, or uttered any gang words or threats.  Nor did he report that his assailants in any other way identified themselves as gang members.  Similarly, no such testimony was forthcoming from any of the other witnesses to the robbery. On the contrary, the record showed that the perpetrators ran off without ever announcing a gang affiliation.  (2 RT 294.)  *Based on the percipient witness' testimony, therefore, nothing distinguishes this event from a non-gang-related street mugging.*

The principal evidence proffered by the prosecution to support the gang enhancement was conclusory opinion testimony from the prosecution's gang expert, Officer Burnett.  Although Burnett provided a wealth of hearsay testimony that petitioner belonged to a gang – a fact that counsel had acknowledged in voir dire (1 RT 111) – she offered nothing but her conclusion that the robbery was gang-related.  Burnett speculated that her testimony regarding the May brandishing incident "appl[ied] to the robbery" (3 RT 729), whatever that phrase might mean, without offering any *facts* to support that speculation.  Similarly, Burnett stated that the money taken in the robbery *could be* "shared with the gang," and that the robbery *could be* a means to "claim[] territory" (3 RT 740), but, again, pointed to no facts confirming that this was what motivated this *particular* robbery.  This may be because, in her view, *all* crimes by a gang member somehow benefit the gang.  (3 RT 751-752).

As a matter of law, however, Burnett's opinion testimony, absent more, is not sufficient to support the enhancement.  For example, in *People*

*v. Ferraez* (2003) 112 Cal.App.4th 925, the court of appeal held: "Undoubtedly, the expert's testimony alone would not have been sufficient to find the drug offense was gang related." (*Id.* at p. 931.) In *Ferraez*, the court only upheld a conviction for street terrorism because the prosecution produced *additional* evidence showing that the defendant (1) had planned to sell illegal drugs in a particular gang territory, (2) had received permission from that same gang to sell those drugs, and (3) was a member of a different gang on friendly terms with that gang. (*Id.*) It was only by coupling the expert's opinion testimony with this corroborative evidence that the jury could "reasonably infer the crime was gang related" and the defendant had the requisite intent. (*Id.*; see also *In re Frank S.* (2006) 141 Cal.App.4th 1192.) Other cases also require more than expert testimony to uphold a gang enhancement. (See, e.g., *In re Jose P., supra*, 106 Cal.App.4th at p. 468 [upholding a gang enhancement in a home invasion robbery because of evidence, *in addition* to the expert testimony, that the robbers were acting on behalf of a gang]; *People v. Gardeley, supra*, 14 Cal.4th at pp. 612-614 [finding a gang-related crime where defendant gang members were selling drugs for the gang when they singled out, threatened, severely beat, and robbed the victim because he was not from the area and was of a different ethnicity, in order to "secure" a drug-dealing stronghold]; *People v. Ortiz* (1997) 57 Cal.App.4th 480, 484-485 [where, in addition to expert testimony, the defendant admitted he wrote gang graffiti in order to frame a rival gang in retaliation for an earlier robbery]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382 [rejecting the argument that the shooting was caused by a personal, rather than gang-related, dispute, because it was "precipitated by crossing out gang graffiti, replacing it with the name of another gang, and then shouting that gang's name to rival gang members"].)

The only other evidence proffered – Martinez's hearsay statements in the 911 call stating that petitioner was responsible for the robbery – is unavailing. First, admission of those statements violated the confrontation clause. (See section II, *supra*.) Second, Martinez was *not* a percipient witness to the Medina robbery. Third, Martinez made no specific reference to a gang or gang members. (2 CT 485.)

In sum, the record does not contain evidence of "reasonable, credible and of solid value" supporting the enhancement(*People v. Ferraez, supra,* 112 Cal.App.4th at pp. 929-930, quoting *People v. Wader* (1993) 5 Cal.4th 610, 640; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

<div align="center">CONCLUSION</div>

For all of the reasons discussed, this Court should grant review.

DATED: May 25, 2007

Respectfully submitted,

John P. Dwyer
Attorney for Petitioner
MARIO AVILA

## CERTIFICATE PURSUANT TO CRC RULE 8.504(d)(1)

I, John P. Dwyer, counsel for petitioner Mario Avila, certify pursuant to the California Rules of Court that the word count for this document is 8,373 words, excluding the tables, this certificate, and any attachment permitted under rule 8.504(d)(3). This document was prepared in Microsoft Word, and this is the word count generated by the program for this document.

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed, at San Francisco, California, on May 25, 2007.

John P. Dwyer
Attorney for Petitioner
Mario Avila

# Exhibit A

Filed 4/17/07 P. v. Avila CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H028881 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS032725A) |
| v. | |
| MARIO AVILA, | |
| Defendant and Appellant. | |

Defendant Mario Avila, a Norteño gang member since 1997, was found guilty at jury trial of assault, street terrorism, robbery, and firearms offenses with gang and firearm enhancements, arising from three separate incidents against the same victims in Salinas in 2003. The trial court imposed a determinate sentence of 17 years, four months followed by an indeterminate term of 30 years to life. On appeal, defendant challenges the admissibility of the evidence, the competence of counsel, and the court's selection of the upper term sentence.

### FACTS

**May 22, 2003 (counts 3, 4, and 5)**

Around 8:30 p.m. on May 22, 2003, Jorge Soto, his wife, Rene Martinez, their teenage daughter, Kelli, and a friend were walking down North Sanborn Street when a gold car with black tinted windows approached. Soto recognized two of the four occupants: defendant, a back seat passenger, and the driver, gang member Juan "Chucky" Ortiz, who lived on the same street as Soto used to. Defendant, Ortiz, and the

two women passengers yelled gang slogans like "Norte" and "threw" four-fingered gang signs at the Soto group as they passed. The car made a u-turn and, when it caught up with the Soto group, stopped. The occupants got out and, as they approached, kept shouting "Norte" and throwing the hand signs. Ortiz was wearing all red. Soto testified that defendant said "one of these days they were going to get a hold of me, and he showed me the gun he had on his waistband." The gun had a chrome handle. The two women kept repeating "bitch, Norte" to Martinez and showed her the hand signs. At some point, defendant became worried someone would call the police and said, "Let's go. We're going to get him later."

Soto and his family reported the incident to the police. Kelli recognized both defendant and Ortiz from other incidents around the neighborhood. Kelli testified that Ortiz had threatened her father on more than one occasion and that they had even fought in the past. She also testified she had seen defendant driving around town with his friends in a "Lexus."

The report of this incident led to a parole revocation hearing for Ortiz. Soto did not testify because he was afraid that even reporting the incident would cause future problems with the gang. Ortiz's parole officer subpoenaed Martinez to testify at the hearing. She testified despite the parole officer's warning that it would be best for her to simply leave.

Defendant was charged in count 3, which was not presented to the jury for a verdict, with threats of violence against Soto, Martinez, and Kelli (Pen. Code, § 422)[1] with the allegations that defendant used a handgun in the commission of the crime (§ 12022.5, subd. (a)) and that he committed the crime for the benefit of a criminal street gang with the intent to promote its criminal conduct. (§ 186.22, subd. (b)(1).) Count 4 alleged street terrorism (*id.*, subd. (a)) with the personal use of a firearm (§ 12022.5) by

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

actively participating in a criminal street gang with knowledge that the members engaged
in a pattern of criminal activity and promoted felonious conduct by gang members.
Count 5 alleged that defendant exhibited a firearm (§ 417, subd. (a)(2)) in the presence of
Soto, Martinez, and Kelli for the benefit of and with the intent to promote criminal
conduct by gang members. (§ 186.22, subd. (d).)

### July 2003 (counts 6, 7, and 8)

At approximately 5:00 p.m. near the end of July, Francisco Medina walked from
his house on Fremont Street down to the Azteca Market. He had to pass by 501 Fremont
Street, the house at the corner which was the center of Norteño gang activity. The market
was also on Norteño turf. Medina purchased two sodas that came in glass bottles.

As Medina left the market, he saw defendant and Manuel Baeza, who lived four
houses down the street from 501 Fremont Street. They were both gang members Medina
recognized from the neighborhood. Medina had seen their tattoos (defendant had a tattoo
in red of women's lips on his neck, and Baeza had the abbreviation of Fremont Street and
an "x" and a "4"). They were with another man in the market parking lot.

Baeza demanded Medina's wallet. When Medina refused, Baeza hit him in the
face, knocking him to the ground, where the three men started kicking him. The assault
continued for about a minute. As Medina stood up, defendant grabbed and held Medina
and Baeza stabbed him in the back with a glass shard from one of the soda bottles. When
people came out of the market to investigate, the three assailants fled, taking Medina's
wallet with them.

The piece of glass cut through Medina's jacket, shirt, and skin, and the wound
bled so much that Medina later discarded the shirt. The wound healed by the time of the
trial, but the scar was still visible. Medina did not seek treatment or report the matter to
the police for fear of retaliation from defendant. He was afraid that if defendant and his
friends saw a police car near his house, they would "do something more against my
family."

Medina believed the attack was in retaliation for his report of a prior incident involving his father, who was robbed and injured by the Norteños. When Medina reported that incident to the police, "they told us it was a bad neighborhood, that we have to move out of the neighborhood." Medina subsequently moved away from the area with assistance from the district attorney's office.

Defendant was charged in count 6 with a serious felony within the meaning of section 1192.7, subdivision (c)(19), and the second degree robbery of Medina (§ 211), with the allegation that defendant committed the crime for the benefit of and to promote criminal conduct by a criminal street gang. (§ 186.22, subd. (b)(1).)

**September 1, 2003  (counts 1 and 2)**

Around 7:30 p.m. on September 1, Soto, Martinez, their friend Mario, Kelli, and her friend Paige picked up Medina at his house to go to a movie. As they drove past 501 Fremont Street, they saw several persons dressed in red drinking beer out in front, and recognized defendant and Baeza. Defendant was dressed in a white football jersey with the number 5 or 05 on it in red.

As the Soto car passed by the house, either defendant or Baeza threw a beer bottle at the back of the car. The bottle smashed on the trunk. Baeza, standing next to defendant, motioned for him to hurry up and go inside the house. At that moment, a white "Lexus" drove down Fremont Street and pulled in front of them blocking their path. Medina recognized the driver as Oscar Porquero, a known Norteño associate of defendant. Soto wanted to get away as fast as possible and drove his car around the Lexus. He got a little way down the street but was stopped by a line of traffic waiting at a red light.

The occupants of the car looked back and saw defendant running down the street towards them with a gun in his hand. Martinez shouted to Kelli to get down, and Soto said something about a gun. When defendant reached the Azteca Market parking lot, he crouched down, pointed the gun at Soto's car, and fired two shots. One of the bullets

4

went through the car's right rear fender and into the wheel well, coming to rest in the trunk between the back seat and the gas tank. Soto testified that if the path of the bullet veered "a little bit more, it would have hit the gas tank, and [defendant] could have killed the whole family."

Soto immediately drove to the nearest police station for help. However, no one was stationed at the front desk, so Martinez used the phone in the lobby with a direct line to the police 911 operator while everyone else waited outside. The tape of the 911 call was played for the jury over defendant's objection. During the call, Martinez described the shooting, the assailants, and the fact that she had previously testified against one of the gang members about an incident at which defendant--the shooter in this case--was also present. She spoke of Medina's stabbing and robbery, and Medina's father's robbery a few months earlier. "It's that little store. They hang out and they rob people. And then I had to take him [Medina's 56-year-old father] to the hospital with a busted head and he's got a heart problem. And now they stabbed the son with a beer bottle, and now they're shooting at us!" Martinez repeatedly expressed fear for her family and explained that defendant and the gang were "partying" at a house only four doors away from her home.

Responding Officer Dagoberto Zubiate testified that he met the group in the police department lobby. Martinez was "upset, to the point she became hysterical; she was crying and pacing back and forth, and repeatedly told me that, you know, she was afraid for her safety, that she was afraid to testify, and she feared retaliation from the gang members."

Only Medina was willing to return to the scene with officers on the night of the shooting. Soto was concerned about giving his real name because of problems his family might face from defendant and the gang. However, all the victims gave statements to the officers and Soto, Medina, and Kelli identified defendant as the shooter.

5

Defendant was charged in count 1 with shooting at an occupied vehicle (§ 246) for the benefit of and with the intent to promote a criminal street gang (§ 186.22, subd. (b)(1)).  Count 2 charged street terrorism (*id.*, subd. (a)) with the personal use of a firearm (§ 12022.5, subd. (a)) which caused the offense to become a serious felony (§ 1192.7, subd. (c)(8)).

As to the latter count, the defense presented a single witness who suggested that defendant might not have been at the scene during the incident, and that if he was, he was incorrectly identified.  However, Medina had walked by 501 Fremont Street less than an hour before the shooting, and had seen defendant standing out front along with eight or nine other Norteños drinking beer.  Defendant's presence at the scene was also noted by several officers who observed him wearing the same football jersey minutes before the shooting when they drove to a nearby house to conduct a probation search of another Norteño gang member.

**Gang evidence**

The prosecution presented uncontested evidence that defendant was an active Norteño gang member.  He and his associates had gang tattoos.  Police searches of various gang hideouts yielded gang-related pictures, posters, CDs, clothing, weapons and ammunition.  Lyrics from one of the CDs suggested the importance of "keeping their territory clean."

Gang expert Officer Vicky Burnett described the Norteños as an organization with a constitution that has 14 tenets, a set of instructions stating how members are expected to behave in and out of custody, and a structured leadership that collects tributes and extends all the way from the streets to the prison gangs.  The gang finances its operations through drug sales and robberies.  Members commit offenses, even petty crimes, for the benefit of the gang on an almost daily basis.  In fact, virtually all crimes committed by members are for the benefit of the gang.  Money from the robberies and other offenses

was commonly funneled back to incarcerated members of the Nuestra Familia prison gang.

Burnett stated that gang culture lives on intimidation and fear. She listed a number of predicate crimes involving Norteños that were not committed against rival gang members, but were still specifically committed for the Norteño gang. Gang members use violence and intimidation against innocent civilians not just to enhance their status in the gang, or their gang's status among other gangs in a particular area, but to intimidate residents on their turf so they can commit other crimes without the fear that the citizens will report them to the police or testify against them. "If the victim and citizens of the community, and rival gang members fear them, they won't report these crimes and, therefore, they avoid prosecution." The gang will specifically target those individuals that have testified against them in the past, or who have reported their actions to the police. Burnett mentioned one incident in which a hospitalized gang member lunged at a witness in an effort to intimidate him when police brought the witness in to identify the suspect.

In Burnett's opinion, defendant, who had been shot weeks before the September shooting, would be expected to retaliate violently. Burnett thought defendant would not necessarily retaliate against the rivals who injured him but would uphold his--and the gang's reputation--by inflicting seemingly random violence on virtually anyone, regardless of whether he or she was affiliated with a rival gang. Eighty-five percent of "gang-related" shootings in Salinas are committed without regard for whether the victim is a gang member. Burnett stated, "[The gang members] just don't care who it is. They are just out to shoot somebody."

Shooting at a car that is on gang turf, even if the driver is not a member of a rival gang, benefits the shooter's gang because it is seen as an act of controlling their territory. Moreover, a shooting committed in front of fellow gang members enhances the shooter's reputation and status within the gang, regardless of whether the victim is a rival gang

7

member, because it shows that the shooter is not afraid to commit a violent act for the gang's benefit.

Moreover, the gang acts as a unit. Thus, if one gang member is suspected of criminal behavior, other gang members will attempt to intimidate witnesses to prevent further statements to the police or testimony in court.

The victims in this case each testified about tremendous fear of retaliation from the gang. Their statements were backed up by testimony from the officers who investigated the case. Furthermore, both Medina and Soto testified that as they were testifying, defendant was flashing gang signs at them from his chair in court. Numerous gang members were present at the courthouse roaming the halls and taking pictures of witnesses. A high ranking member of the Nuestra Familia was also seen in the halls at the courthouse.

The jury convicted defendant of all counts and found true all the enhancements. The information also alleged that defendant had a strike prior robbery adjudication as a juvenile which would double any state prison commitment he received. (§ 1170.12, subd. (c)(1).) Defendant admitted the prior before the jury returned to the courtroom to render its verdict. When the trial court sentenced defendant, it used the robbery charge in count 6 as the base term. The court selected the three-year midterm, doubled to six years for the strike prior, plus 10 years for the street terrorism enhancement. The court added an eight-month consecutive term (doubled to 16 months for the strike) for the street terrorism conviction in count 4. The court imposed an indeterminate term of 15 years to life (doubled to 30 years because of the strike) for count 1, shooting at an occupied vehicle. The court selected the upper term for the sentences on counts 2, 7, and 8 and stayed them and the sentence on count 5 under section 654. This appeal ensued.

## ISSUES ON APPEAL

Defendant contends: (1) the enhancement for street terrorism charged in connection with count 6, the robbery of Medina, is not supported by substantial evidence;

8

(2) the trial court erred in admitting the tape of Martinez's 911 call from the police lobby; (3) trial counsel was ineffective because he failed to: (a) object to testimony that gang members were outside the courtroom, (b) request an evidentiary hearing whether jurors were biased by their own observations of gang members inside or outside the courtroom, and (c) object to the use of defendant's juvenile adjudication as a strike prior; finally, (4) the trial court's imposition of an upper term sentence violated *Blakely v. Washington*[2] and defendant's constitutional right to a jury trial.

<u>SUFFICIENCY OF THE EVIDENCE</u>

Defendant claims the evidence is insufficient to support a true finding on the enhancement that the robbery of Medina was for the benefit of a criminal street gang because Medina did not testify that the assailants wore gang colors, threw gang signs, uttered any gang words or threats, or in any other way identified themselves as gang members, and witnesses, who came out of the store after the attack before the assailants fled, also gave no such testimony. Defendant concludes that "[b]ased on the percipient witness' testimony, therefore, nothing distinguishes this event from a non-gang-related street mugging." (Italics removed.)

In assessing a sufficiency of the evidence argument, the test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) The court must view the evidence in light of the whole record, drawing all inferences in favor of the judgment and must presume the existence of every fact in support of the judgment that could reasonably be deduced from the evidence. To uphold a conviction, the record must contain evidence that is reasonable, credible, and of solid value such that any rational trier of fact could have been persuaded of the defendant's guilt. (*People v.*

---

[2] *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*).

*Olguin* (1994) 31 Cal.App.4th 1355, 1382 (*Olguin*); *In re Jose P.* (2003) 106 Cal.App.4th 458, 465 (*Jose P.*); *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

"[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members [shall receive additional punishment]." (§ 186.22, subd. (b)(1).)  Sufficient evidence supporting this enhancement can be found in expert testimony showing that the crime (in our case, robbery) enhances a gang's reputation coupled with other relatively insignificant evidence. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 (*Ferraez*).)  The events leading up to, and circumstances surrounding, an assault can be crucial to determining that conduct that may not otherwise have been associated with gangs, was in fact gang-related. (*People v. Manriquez* (1999) 72 Cal.App.4th 1486, 1491.)  For example, where a defendant has admitted " 'kicking back' " with gang members and knowing of a rivalry between particular gangs, knowledge of the gang's likely actions in a certain future situation may be attributed to him, even where there is no evidence of gang membership, nor evidence that the defendant had ever committed another crime with the gang. (*Ibid.* [evidence of defendant's knowledge that a drive-by shooting would occur in the car in which he was riding even though he had been denied membership in the gang and had not participated in any prior gang offenses sufficient].)

There is no requirement that gang colors be worn or gang slogans be shouted for an assault to be gang related.  Circumstantial evidence discovered after the crime which connected the victim to the defendant and the defendant to the gang is relevant. (*Jose P.*, *supra*, 106 Cal.App.4th at pp. 464-466, 468 [pictures found in the defendant's bedroom after the robbery, references to Norteños in a diary kept by defendant's ex-girlfriend and one of the robbery victims who may have colluded with the robbers, a note authored by the Norteños attempting to dissuade the family from testifying].)  Furthermore, expert

10

testimony may help the jury understand the significance of particular acts in light of gang culture and habits. (*Ferraez*, *supra*, 112 Cal.App.4th at p. 930.)

In the instant case, there was ample testimony that defendant was a gang member. The defense conceded the matter in jury voir dire. Officer Eulalio Villegas, assigned to the violence suppression unit, testified that he had contacted defendant several times in the past, and saw defendant wearing red, a color associated with Norteños, associating with several other gang members. Defendant had a tattoo of a kiss (a pair of lips) in red ink on his neck. Villegas had seen other tattoos on defendant's person but had not taken notes or pictures of them. Villegas thought the lips were a gang-related tattoo because he had seen two other individuals whom he knew to be gang members who had the tattooed lips on the same place on the neck and he had not seen the tattoo on persons who were not gang members. Also, defendant admitted to Villegas that he was a member of the Norteños.

In addition, Soto, Martinez, Kelli, and Medina knew defendant, Ortiz, and Baeza as gang members. Medina had seen defendant's "kiss" tattoo and the Fremont Street abbreviation, the "x" and the "4," on Ortiz. Ortiz on occasion dressed all in red, the gang color, and the number 5 or 05 on the football jersey defendant was wearing on the night of the shooting was red. The victims knew the house at 501 Fremont, where defendant was seen drinking beer in the front yard with other gang members before the shooting, was the heart of gang activity. Medina knew the Azteca Market was on gang turf. When he was knocked down, kicked, stabbed, and robbed after buying his sodas, he did not report the matter to the police in case defendant and his gang would "do something *more* against [his] family." (Italics added.) Medina believed the robbery was in retaliation because he had reported a gang-related assault and robbery of his father in the past.

Martinez knew about both Medina's and his father's assault and robbery; she had taken Medina's father to the hospital. Martinez had testified at Ortiz's parole violation

hearing despite the parole officer's warning not to. Soto, Martinez, Kelli, and Medina had been the target of intimidating activity by defendant in the past.

As for the robbery, defendant and Baeza acted together in knocking down, kicking, stabbing and robbing Medina. The gang members, drinking beer with defendant before the shooting, and the gang member driving the Lexus to cut off Soto's car to enable the shooting, and defendant, who shot into Soto's car, acted together to benefit the gang. The shooting enhanced defendant's and the gang's prestige and intimidated innocent residents of the area. Even if the robbery of Medina did not yield much money, expert Burnett testified that money that was taken during robberies is "shared with the gang, used to support the gang, [and] in many endeavors." In addition, Burnett testified that the robbery allowed the gang to control, or "clean[]" its territory. She had talked to employees of the store who were reluctant to report the gang's numerous transgressions against them out of fear of retaliation and to numerous residents of the area who had had similar experiences. According to Burnett, the robbery of Medina benefited the Norteños gang "by causing that fear that they need so much to allow them to commit their crimes without fear of prosecution. If the victim and citizen's [sic] of the community, and rival gang members fear them, they won't report these crimes and, . . . they avoid prosecution."

Finally, Burnett testified to other incidents of intimidation of witnesses who testify against gang members including at defendant's trial. Burnett observed "unusual activity outside the courtroom," the fact that numerous Norteños had been seen in and around the courthouse, and that Norteños were taking pictures of potential witnesses, including Martinez, with their camera phones in an effort to intimidate them. Indeed, defendant himself was throwing four-fingered gang signs at Medina and Soto as they testified at the trial. There was substantial evidence to support the enhancement.

## ADMISSION OF THE 911 TAPE

Next, defendant contends that the trial court abused its discretion in admitting Martinez's statement via the 911 tape. He asserts the statement was not admissible under the spontaneous utterance exception (Evid. Code, § 1240) because of the opportunity for "collusion" during the 10-minute time lapse between the shooting and the making of the statement; certain portions of the statement (such as Martinez's recollection of the robberies of Medina and his father) did not relate to the shooting itself; and finally, even if the statement satisfied the spontaneous utterance exception, its admission violated his rights under the Sixth Amendment Confrontation Clause because Martinez did not testify at trial and was not subject to cross-examination.

"Evidence of a statement is not made inadmissible by the hearsay rule of the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) " '(1) [T]here must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) " 'The basis for this circumstantial probability of trustworthiness is "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' " Whether a statement was made spontaneously is a question of fact in which the trial court is vested with its broadest discretion. (*Ibid.*)

Courts look to the totality of the circumstances in determining whether a statement was spontaneous. "[T]he mere ' " 'lapse of time between the event and the declarations

13

[will not] deprive[] the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.' " ' " (*People v. Smith* (2005) 135 Cal.App.4th 914, 923.) The crucial element is the mental state of the speaker at the time the statement was made. (*People v. Raley* (1992) 2 Cal.4th 870, 892-893.)

Defendant asserts Martinez's statements on the tape were not made spontaneously since they were made 10 to 15 minutes after the shooting occurred and that period gave her "more than adequate opportunity to recover her 'reflective powers,' and, perhaps, to 'contrive and misrepresent' her testimony." In addition, Martinez's opportunity to develop a conscious narrative of the events was "greatly enhanced by the fact that she spent those 10-15 minutes in a car with her husband, daughter, and friends, all of whom had just witnessed the same event and discussed and compared their observations."

The evidence for defendant's conclusion there was "collu[sion]" (despite the denials of Medina and Soto in court) was that all the witnesses--Medina, Soto, and Kelli in court and Martinez on the tape--claimed the car that obstructed their path was a "Lexus" while police testimony stated it was a Mazda 626. Second, Martinez knew of and spoke about the robbery perpetrated by defendant and Baeza on Medina a few weeks earlier. Third, Kelli admitted that she discussed the identity of the shooter in the car with Martinez and that the others in the car talked about what they would say. However, she testified that no names were said and no one said the name "Manuel" although her friend Paige thought she recognized someone.

In addition, the tape included "several damaging statements that were not based on [Martinez's] observations and did not 'relate to the circumstance of the occurrence preceding it' as required by Evidence Code section 1240 and *Poggi*." Martinez said on the tape that the same people involved in the shooting had robbed Medina a few weeks earlier, that she had to take Medina's 56-year-old father to the hospital with a "busted head and he's got a heart problem. And now they stabbed the son with a beer bottle, and

now they're shooting at us!"  These statements, and that "they 'hang out and . . . rob people'--do not 'relate to the circumstance of the occurrence preceding it,' namely the shooting . . . [and] they do not 'narrate, describe, or explain . . . an event perceived by' Martinez."  Defendant says the only way Martinez could have had the information about Medina's being robbed "was by discussing the matter with Medina during the ride to the police station."  However, examination of Martinez's remarks as a whole shows that defendant's last inference is unfounded.

The trial court reasonably found Martinez's 911 call to have been made under the stress and excitement of the shooting just 10 minutes before the call.  After listening to the tape, the court noted that Martinez "was audibly upset and excited by the episode."  The responding officer described her as "upset, to the point she became hysterical; she was crying and pacing back and forth, and repeatedly told [him] . . . she was afraid for her safety, that she was afraid to testify, and she feared retaliation from the gang members."  The 911 operator repeatedly attempted to calm Martinez down and repeatedly reminded her she was inside a police station, but Martinez kept focusing on the children in the car.  The language Martinez employed during the call shows a lack of reflection.  Not only are her recollections of the incident and her beliefs as to the motivation for it presented chaotically, but Martinez was unable to calm herself sufficiently to listen to and respond to the operator's questions.  Martinez's statements were apparently generated from her own internal responses to a life-threatening, frightening attack.

Even the statements defendant claims referred to actions beyond the shooting itself were relevant to "narrate, describe, *or explain*" the incident.  (Evid. Code, § 1240, subd. (a), italics added.)  Martinez's statement of belief in the motivations of the attackers assists in identifying the perpetrators and gives a possible explanation for the attack.  (*People v. Farmer* (1989) 47 Cal.3d 888, 905.)  These statements of Martinez explained the incident both by providing further details about the identity of the others involved in

15

blocking the car earlier and in the shooting, and by showing that the motive for the shooting was potentially gang related. "[W]hile they do not describe the attack, [they] do help to explain an event perceived by the declarant and are, therefore, admissible." (*Ibid.*)

Finally, defendant claims admission of the tape violated his Sixth Amendment right to confrontation. Martinez did not testify at either the preliminary hearing or the trial and was not cross-examined. Defendant claims that the taped statement was "testimonial" (that is, it was "made to a government official under circumstances in which any reasonable person would ' "reasonably . . . believe that the statement would be available for use at a later trial." ' (*Crawford* [*v. Washington* (2004)] 541 U.S. [36], 52 [(*Crawford*)])," and that the government did not carry its burden of showing that the witness was unavailable. "Indeed, the prosecution made no effort to prove her unavailability because it maintained that *Crawford* was inapplicable since the 911 tape was admissible under a hearsay exception."

The statement at issue in *Crawford* was made to police by Crawford's wife, Sylvia, after Crawford was arrested for stabbing Kenneth Lee. Police gave the *Miranda*[3] warnings to Sylvia as well as to Crawford and interrogated each of them twice. Sylvia generally corroborated her husband's story about the events leading up to the fight, but her account of the fight itself was arguably different--particularly with respect to whether the victim had drawn a weapon before Crawford assaulted him. Crawford was tried for assault and attempted murder and claimed self-defense at trial. Sylvia did not testify because of the Washington State marital privilege. However, the Washington privilege does not extend to a spouse's out-of-court statements admissible under a hearsay exception, so the state sought to and did introduce Sylvia's tape-recorded statements to the police as statements against penal interest and evidence that the stabbing was not in

_____

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

16

self-defense. The defense objected unsuccessfully that admission of the statements violated the confrontation clause. (*Crawford, supra*, 541 U.S. at pp. 38-40.) The United States Supreme Court granted certiorari to determine that issue. (*Id.* at p. 42.)

The Sixth Amendment Confrontation Clause provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " (*Crawford, supra*, 541 U.S. at p. 42.) This guarantee applies not only to in-court testimony, but also to out-of-court statements introduced at trial, regardless of admissibility of statements under the law of evidence. (*Id.* at p. 51.) The Clause "applies to 'witnesses' against the accused--in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. . . . [¶] Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' [citations] . . . ; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition--for example, *ex parte* testimony at a preliminary hearing. [¶] Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." (*Id.* at pp. 51-52.)

The court concluded that "Sylvia's recorded statement, knowingly given in response to structured police questioning, qualifies [as 'testimonial'] under any conceivable definition." (*Crawford, supra*, 541 U.S. at p. 53, fn. 4.)

In our case, the trial court, after listening to the tape and hearing arguments, found that the statement was "within the purview of [Evidence Code section 1240]. This lady had just been a victim of a shooting, and she was aware of that. She was audibly upset and excited by the episode. And the content of her statement is a description generally of what happened. She does not identify anybody, namely, the defendant. And there is other evidence that the same shooting did occur. [¶] . . . It's close in time to the event of the upset or urgency of the statement. It is reflected in its tone and content. And there does not appear to have been a significant amount of intervening time between the event itself, which was an extremely exciting event, and the statement . . . that's being made."

We agree. Martinez's statements were excited utterances not made in response to "structured police questioning" despite the operator's attempts to calm Martinez.[4] The statements were made shortly after the time of the incident. Martinez and the other occupants of the car drove immediately to the police station. Soto and Medina testified at

---

[4] When they got to the police station, everyone but Martinez stayed in the car. Martinez was worried about their safety--the transcript of the tape has the 911 operator responding, "Ma'am! I can't help you if you are going to yell at me. You're in the Police Department! [¶] [MARTINEZ]: My kids are outside. [¶] [OPERATOR]: Listen to me! Where did this happen?" When Martinez started to convey the information, the operator interposed, "Hold it, ma'am calm down. Stop! Slow down! [¶] [MARTINEZ]: Well, have you had guns shooting at you? [¶] [OPERATOR]: Ma'am! [¶] [MARTINEZ]: I'm scared! [¶] [OPERATOR]: Ma'am! You're in the police department--you understand that? I think you're pretty safe. And I can't help you if you're all excited." A little later, the operator said, "Ma'am, just take it easy and answer my questions as they're asked and it'll go real smooth. What is your name?" Martinez answered the question, but added, "But lemme [sic] tell you something real quick. I just testified um against somebody that pulled a gun on me and my daughter and a little three year old girl on Sanborn." Martinez kept talking with occasional interruptions by the operator ("Ok, Ma'am!" "Hold on please." "Ok, hold on for a sec...") as the operator tried to interpose questions. Finally, the operator said, "Ok, I understand that you are worked up, but you're in the police station, you are about as safe as you can get right now, ok?" The operator finally told Martinez to bring everybody inside the police department, lock the doors, and stay inside and the tape ended.

trial that the occupants of the car did not talk to each other about the shooting because they were nervous, upset, and frightened. Soto said Martinez was "very nervous and . . . we were all scared."

It is clear even from a transcript of the tape how excitable and upset Martinez was. In addition, Officer Zubiate, who was called in to the police department to take a report from the victims, stated, "[a]ll six individuals were upset. I believe the females had been crying, and they were pacing back and forth in the lobby. And they kept looking out the front doors of the lobby, and they repeatedly stated that they were afraid. [¶] . . . [¶] All of them expressed that they feared for their safety, they feared retaliation because of past threats from gang members."

There was nothing in the statements or in the transcript to suggest that Martinez gave her statements with the thought that they would be used in court for evidence or that the police questioners asking her what happened were seeking her statements for use in court. It would be unreasonable to prohibit evidence concerning spontaneous declarations in every case where they are promoted by a simple inquiry as to what happened. (*People v. Solomon* (1969) 1 Cal.App.3d 907, 911.) Clearly, Martinez was reporting a crime and seeking help, and the operator was trying to get enough information from her for police to conduct an investigation. The evidence fully supported the court's ruling. The use of Martinez's spontaneous statement as a firmly rooted exception to the hearsay rule did not violate defendant's right of confrontation of witnesses. (*People v. Alvarez* (1996) 14 Cal.4th 155, 187.)

<u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Next, defendant claims trial counsel was ineffective in failing (1) to object to testimony that gang members were outside the courtroom, (2) to request an evidentiary hearing on whether any jurors were biased by their own observations of gang members inside and outside the courtroom, and (3) to object to the use of defendant's juvenile adjudication as a strike prior.

Defendant states that "[t]he government made the threat posed to the community by Norteños [*sic*] gang members a dominant theme at [defendant's] trial. Jurors[, who had been told they would be known only by number during the trial and that their names would be kept under seal in the clerk's office and not released to anyone,] were given the message by both the court and the prosecution that [defendant] and his associates were dangerous individuals who represented a direct threat to them and their families simply because they served on the jury. This message of intimidation continued throughout the trial, from the moment the jurors were told during voir dire that they would remain anonymous and be called upon by juror number only, and during their deliberations when they were escorted from the courthouse to their cars. [¶] The prosecution inflamed the matter by introducing irrelevant and prejudicial testimony from its expert witness that gang members were lurking outside the courtroom with cell-phone cameras in order to intimidate others. This fear-mongering was so effective that it prompted the jurors to send a note to the trial court seeking law enforcement protection. One juror even sought-- and obtained--a court order to be excused from the jury based due to [*sic*] her fear engendered by the expert's testimony. Trial counsel, however, did not contemporaneously object to admission of the testimony that gang members were roaming the courthouse and did not seek an instruction not to consider the evidence." Trial counsel also failed to move for a mistrial or request an evidentiary hearing to require the government to rebut the heavy presumption of prejudice after the court learned from jurors that they had seen gang members in the courtroom and courthouse, were concerned for their safety, and had conversed with the bailiff about gang members.

The People counter that although "some of the jurors in the case expressed legitimate concerns regarding safety, [defendant's] trial counsel used the evidence [in closing argument] to play upon the jury's fear and convey a message that [the] prosecution was attempting to use 'scare' tactics to bolster an otherwise 'weak' case. In light of the ample evidence of gang activity in the case, and the overwhelming evidence

of [defendant's] guilt of all three offenses, counsel's decision to turn the jurors' fears back upon the prosecution's case was reasonable. Furthermore, for the same reasons, counsel's failure to act could not have been prejudicial, even it if was not done for strategic reasons."

To prevail on a claim of ineffective assistance of counsel, a defendant must show not only (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, but also (2) that, as a result, the defendant was prejudiced, i.e., there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.) "[I]n order to establish ineffective assistance of counsel, a defendant must show that counsel committed 'errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " (*Morris v. State of Cal.* (9th Cir. 1991) 966 F.2d 448, 456, cert. den. 113 S.Ct. 96 (1992).)

Prevailing norms of practice are guides to determining what is reasonable, but they are only guides. There is a wide range of reasonable professional conduct and a strong presumption that counsel's conduct fell within that range. (*Strickland v. Washington* (1984) 466 U.S. 668, 688-689 (*Strickland*).) "In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions. [Citation.] Were it otherwise, appellate courts would be required to engage in the ' "perilous process" ' of second-guessing counsel's trial strategy. [Citation.] Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Frye* (1998) 18 Cal.4th 894, 979-980.)

When the reason for counsel's action or inaction is apparent on the record, the court will determine whether that reason reflects reasonably competent performance by

21

an attorney acting as a conscientious and diligent advocate. If no explanation appears, an ineffective assistance of counsel claim will be rejected unless the attorney was asked for and did not offer an explanation, or there can be no satisfactory explanation. (*People v. Coddington* (2000) 23 Cal.4th 529, 652.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland, supra*, 466 U.S. at p. 697.)

Here, it is clear that gang evidence, both of specific crimes performed by gang members and expert testimony to explain the significance of certain other facts (the color red, for example) and acts (taking cell-phone pictures) had a legitimate bearing on the offenses and enhancements charged. The gang connection between defendant's conduct and associates permeated the trial. As the People state, "[T]he breadth of gang evidence was entirely necessary to show the extent to which [defendant] and his Norteño cohorts would go to retaliate against past witnesses, intimidate future witnesses, and control their 'turf.' Not only did the expert explain how each of the crimes was gang related, but each of the lay witnesses described their own fears of retaliation that were caused by the gang's prior actions. . . . Thus, when Officer Burnett testified that numerous Norteño members, as well as a high ranking member of the Nuestra Familia, were 'lurking' outside the courtroom and that some were taking pictures of witnesses in an effort to intimidate them, this evidence was admissible both to corroborate Officer Burnett's opinions about the extent to which the gang would go to help its members, as well as to assist the jury in determining the credibility of the various witnesses who braved the Norteño gauntlet to testify."

The basis for defendant's first complaint, counsel's failure to object to testimony about gang members outside the courtroom, arose after Officer Burnett testified about the origin, history, inner workings, and techniques of the gangs. After explaining how the gang members try to intimidate local residents and store owners from reporting crimes, and to keep witnesses from testifying, "[i]mmediately thereafter, Officer Burnett,

prompted by prosecuting counsel, strongly suggested to the jurors that Norteño[] gang members were systematically engaged in intimidation in this very trial." Burnett testified to observing "unusual activity outside the courtroom" and named a number of "admitted Norteño[] gang members" and a "high in status" Nuestra Familia gang member who were watching the courtroom. She also observed defendant's family and others whom she had named with picture phones and contacted "one of the females and asked her if she was taking my picture."

Defendant claims that this testimony had no legitimate bearing on the offenses charged and it tended to evoke an emotional bias against defendant and would have excluded it if counsel objected. Defendant is wrong.

Evidence of a defendant's gang affiliation--including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like--is relevant and admissible regarding a charged offense, as evidence can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Furthermore, Burnett's testimony about the goings-on at the courthouse was that of a percipient witness to the "roaming," gang member surveillance of the courtroom, and taking pictures of witnesses. Her observations were probably more informed than those of most witnesses to the activity because she knew or knew of the persons involved and because of her specialized training and knowledge in Salinas street gangs and the Norteños in particular. The evidence was relevant to a factual issue before the jury because defendant was charged not only with the underlying crimes, but also with gang enhancements. Burnett's testimony was especially relevant on the latter.

It was also relevant to witness credibility. (Evid. Code, § 780.) Evidence of threats by gang members against witnesses is admissible to assist the jury in assessing the credibility of the witnesses (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449

23

(*Sanchez*)) as is evidence a witness is afraid to testify and testimony a witness is fearful of retaliation. (*Id.* at pp. 1449-1450.)

Second, defendant complains that trial counsel should have asked the court for an evidentiary hearing to require the government to rebut the heavy presumption of prejudice caused by the jurors' concern for their safety after seeing gang members in the courtroom and courthouse, and speaking to the bailiff about gang members.

Defendant states that after Burnett's testimony, the jurors then sent the court a message (apparently written by the bailiff)[5] stating that they had "observed gang members within the building and in the court room," expressing concerns about "potentially being photographed by gang members with cell phones," and telling the court that they "park far away from the court house and might be harassed by gang members as [they] go to and from their vehicles." In response, the court ordered the bus that goes to the train station to take the jurors to their cars and to have a bailiff on the bus.

The next morning, after a note from a juror and a hearing in chambers, during which the juror described her fear to the court and said it would prevent her from being able to reach a decision in the case, the court excused the juror for cause. Defense counsel stated it was becoming "more clear" that with the testimony of Burnett the day before and the "transportation issue that this juror just described . . . , it seems it has increased a sense of fear among the jurors." Trial counsel stated he thought other jurors might also be thinking "that the Court or the sheriff believes that they are in danger" and

---

[5] The bailiff's handwritten note stated: "Judge Moody, [¶] Several jurors have expressed concerns about their own safety. The jurors have observed gang members within the building and in the court room. [¶] The jurors have expressed two specific concerns. They are: [¶] (1) Potentially being photographed by gang members with cell phones. [¶] (2) Jurors are concerned that they park far away from the court house and might be harassed by gang members as the jurors go to and from their vehicles. [¶] I explained to the jurors that anyone caught photographing or harassing a juror would be immediately arrested. [¶] The jurors have requested that the court address their concerns during the trial."

he asked the court to address that "directly, because I feel like we're getting increasingly to the point where this jury cannot maintain objectively what we're hoping for them to do." The court declined to solicit information from the jurors but addressed the jurors thusly:

"I wanted to tell you that in response to some concerns that a couple of jurors expressed yesterday, we made arrangements to bring a bus in--actually the bus that transports county employees and jurors from the courthouse to the parking lot over by the train station on a routine basis everyday. We had them come and take you as a group out to your cars. In doing that, I certainly did not mean to create an impression that I have any concern about your safety. . . . [W]ell, let me state that differently. Of course, I have concern about your safety, but I have no reason to believe that there's any problem in that area with respect to any of you. [¶] I've been doing this for 33 years. We've all been involved in countless jury trials involving charges of violence in gang violence [sic], and we've never had an episode in this county where a juror has been in any way harmed as a result of this court connection. So I have no specific reason to feel that there's any problem. We took some action to assuage some of the concerns some jurors had, and I don't want to make it appear that--that those concerns have any actual basis. But at the same time where people have those concerns, I don't want to just leave them worrying about them either. That's why we did what we did."

A criminal defendant has a right under both the state and federal Constitutions to an unbiased, impartial jury. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler*); U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) A juror is considered biased if he or she " ' "has been improperly influenced" ' " by something that was not received as evidence at the trial. (*Nesler*, *supra*, 16 Cal.4th at p. 578.) Juror misconduct includes the receipt of information about a party or a pending case that was not part of the evidence at trial, even if the information was received inadvertently. (*Id.* at pp. 578-579.) However, " 'it is

*virtually* impossible to shield jurors from every contact or influence that might theoretically affect their vote.' " (*People v. Danks* (2004) 32 Cal.4th 269, 303 (*Danks*).)

" '[T]he introduction of much of what might strictly be labeled "extraneous law" cannot be deemed misconduct.  The jury system is an institution that is legally fundamental but also fundamentally human.  Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience.  That they do so is one of the strengths of the jury system.  It is also one of its weaknesses; it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court.  Such a weakness, however, must be tolerated.  "[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors."  [Citation.]  Moreover, under that "standard" few verdicts would be proof against challenge.' " (*Danks, supra,* 32 Cal.4th at pp. 302-303.)

Here, there was no juror misconduct, that is, the jurors' observations of who else was in and around the court house was not the receipt of information about a party that was not part of the evidence at trial.  (*Nesler, supra,* 16 Cal.4th at pp. 578-579.)  The percipient witnesses at trial--Soto, Medina, and Kelli--plus Burnett, had testified and had been cross-examined about intimidation.  In addition to intimidation in the abstract, Burnett described intimidating behavior at the courthouse that she personally observed, whose significance corroborated her expert testimony on gang operations.  The jurors could not help but observe examples of that behavior while they were about their lawful business coming and going to the courtroom.

Consequently, there was no juror misconduct for defense counsel to seek inquiry into.  In a case of even more egregious intimidation, it was held that a juror did not commit misconduct, even inadvertently, where the juror, who was already fearful of defendant's family, observed defendant's family members parked outside her home, even if the persons were arguably there to intimidate her into changing her vote in favor of the

defendant, since there was no communication, no gestures, and no display of weapons. (*In re Hamilton* (1999) 20 Cal.4th 273, 306.) In our case, there were similarly no complaints by the jurors that gang members attempted communication, gestured, or displayed weapons to them. The jurors did not even complain that photographs *had* been taken of them or that they *had* been harassed going to and from their cars. The photos were a "potential" concern and harassment was a possibility that "might" happen. We are satisfied there was no substantial likelihood that the jurors were actually biased in the sense that they were unable to render a verdict based solely on the evidence received at trial. (*Nesler, supra*, 16 Cal.4th at pp. 583-585.)

Defendant complains that jurors spoke to the bailiff about the gang members and sent a note (written by that bailiff) to the court. First, the bailiff was the jurors' conduit to the court. Via the note, the jurors properly brought their concerns before the court. The one juror who asked to be released from jury service because of her fears properly had a hearing outside the presence of the other jurors and the court made an individualized decision based on the evidence she presented. The other jurors had not brought any matters to the court's attention that required inquiry on an individualized basis, and the court properly acted to assuage the general concerns of the remaining jurors without suggesting fears that had not originated with the jurors. Furthermore, the jurors did not discuss the facts of the case with the bailiff; they discussed their observations and the stress it caused them for the purpose of having their concerns communicated to the court. A juror does not commit misconduct simply by discussing the stress caused by jury service with a nonjuror. (*Danks, supra*, 32 Cal.4th at p. 304.)

In light of our discussion, there was no ineffective assistance of defense counsel in failing to request an evidentiary hearing or a mistrial as defendant complains. Nor would this evidence have been excluded with a proper objection. Defense counsel, realizing that gang testimony was inevitable given the facts of the case and the charges, tried to turn the jurors' concerns to his advantage. As the People say, "the entire trial was about

27

the reign of terror brought on by [defendant] and his gang.  Even [defendant's] trial counsel recognized, and attempted to utilize, this."

During his closing argument, defense counsel reminded the jurors that when they were selected, they were told there would be gang evidence, and that "it was important that each of you felt as though you could acknowledge that aspect of the case, but still be able to maintain your objectivity."  Counsel stated he felt "that there's a character assassination that goes on here.  It's not a coincidence how much, how heavy the gang evidence is here.  [¶] Now, there is no question that the government has a burden to prove elements in this case.  But there's a fanning of the flames; there is--there's an attempt to try to make you feel fear, okay.  And, again, you need to be able to step back and not be affected by what is the fear that's being pushed upon you. . . .  It's . . . what I call sort of a scare marker . . . and if we make the jury afraid enough, then they're going to have trouble recognizing that there's problems with the proof in the case.  So, again, I caution you, watch out for that, as you are analyzing things, and discussing it, when you're deliberating.  Think about the extent to which fear is playing a part in your thinking.  This is made even more serious by some of the testimony of Vicky Burnet [*sic*].  She . . . testified and really speculated about what she believed was going on outside of this courthouse, which she believed was going on by at least one person in my client's family, pure speculation."

Counsel then raised questions in great detail about the ability of the percipient witnesses to make the observations they claimed to have made or their motives for testifying to facts that they did (including questioning whether Soto and another witness had moved on from a possible earlier rival gang affiliation) before going on to other aspects of the case.

Counsel made a reasonable tactical decision under the circumstances of this case. Gang evidence is admissible to show gang presence of activity at or near a courthouse (*People v. Carter* (2003) 30 Cal.4th 1166, 1201), motive (*People v. Frausto* (1982) 135

28

Cal.App.3d 129, 141), whether harassment and graffiti should be taken seriously as witness intimidation or whether they constituted nothing more than empty threats (*Olguin*, *supra*, 31 Cal.App.4th at p. 1368), to assist the jury in assessing the credibility of witnesses who were threatened by gang members (*Sanchez*, *supra*, 58 Cal.App.4th at p. 1449), to assist in determining credibility where a witness testifies he or she is afraid to testify (*People v. Warren* (1988) 45 Cal.3d 471, 478) or is fearful of retaliation (*People v. Malone* (1988) 47 Cal.3d 1, 30).

Counsel was not deficient in failing to object to the admission of such evidence. "The prejudice that [Evidence Code] section 352 [probative value outweighed by prejudicial effect] ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of a substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009.)

Finally, defendant claims that counsel was ineffective for failing to object to the use of the juvenile strike adjudication to double defendant's sentence under section 1170.12, subdivision (a)(1). The use of juvenile priors in adult sentencings is very much in controversy at the present, but in light of our modification of the sentence following the United States Supreme Court's holding in *Cunningham v. California* (2007) 549 U.S. __ [127 S.Ct. 846] (*Cunningham*), we need not discuss counsel's competence as to that issue. As for the rest, counsel's performance was adequate.

## IMPOSITION OF AN UPPER TERM SENTENCE

Finally, defendant declares that the court's imposition of the upper term on counts 2, 7, and 8, sentences which were stayed, also violates *Blakely*, *supra*, 542 U.S. at pages 301 through 305, and *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*). Defendant declares an upper term that may be based only on a finding of aggravating circumstances (§ 1170, subd. (b)), by the court, in lieu of a jury determination, violated defendant's rights under the Sixth Amendment and due process.

Although at the time the briefs were filed in this case, this claim had been rejected by the California Supreme Court in *People v. Black* (2005) 35 Cal.4th 1238, since then the United States Supreme Court rejected the reasoning of *Black* in *Cunningham*, *supra*, 549 U.S. at page __ [127 S.Ct. at p. 871]. *Cunningham* held that the jury trial beyond a reasonable doubt requirements of factfinding under *Apprendi*, *supra*, 530 U.S. at page 490 applies to the factfinding underpinning this state's Determinate Sentencing Law. Therefore, the trial court's finding of factors in aggravation by a preponderance of the evidence (Cal. Rules of Court, rule 4.420(b)) may not constitutionally be used to impose an upper term.

Defendant correctly argues that "[r]emanding for a jury trial would not be appropriate because (1) the Penal Code makes no provision for a jury trial on aggravating factors (see Pen. Code § 1170, subd. (b) [requiring a court determination]); (2) the People may not engage in piecemeal trial on issues not set forth in the information (*People v. Najera* (1972) 8 Cal.3d 504, 508-512); and (3) federal double jeopardy bars a second trial on a greater offense after the jury is discharged (*Brown v. Ohio* (1977) 432 U.S. 161, 166-168; *United States v. Blanton* (9th Cir. 2007) [476 F.3d 767] [no retrial on sentencing factors that under *Apprendi* should have been proven, but were not, at the initial trial]) and bars holding part of the trial before a different jury. (*Oregon v. Kennedy* (1982) 456 U.S. 667, 671-672.)"

30

The judgment is amended to reflect middle term sentences on counts 2, 7, and 8. (§ 1260.)

## DISPOSITION

The clerk of the superior court is ordered to correct the abstract of judgment to reflect midterm sentences on counts 2, 7, and 8 and forward a corrected abstract of judgment to the Department of Corrections.  The judgment is affirmed.

_____
Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.

31



FR. MARIO AVILA #V-86646
C6-218- CSP SACRAMENTO
P.O. Box 29-0066
REPRESA CA 95671

RECEIVED

JUN 6 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

OFFICE OF THE CLERK U.S DISTRICT
COURT NORTERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO CA 94102.