UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MARIO AVILA,<br><br>              Petitioner,<br><br>       vs.<br><br>CLARK E. DUCART, Acting Warden,[1]<br><br>              Respondent. | Case No:  C 08-2882 SBA (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

        Petitioner Mario Avila ("Avila" or "Petitioner") brings the instant pro se habeas action under 28 U.S.C. § 2254 to challenge his 2005 conviction and sentence rendered in the Monterey County Superior Court.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the petition for the reasons set forth below.

**I.      BACKGROUND**

        In March 2005, a Monterey County Superior Court jury convicted Petitioner, a Norteño gang member since 1997, of assault, street terrorism[2], robbery, and firearms offenses with gang and firearm enhancements.  These charges arose from three separate incidents in May, July and September 2003, all involving the same victims.  According to Respondent, "[Petitioner] engaged in a campaign of terror over the charged five-month period, in an effort to intimidate the members of his community into remaining silent so

---

        [1] Clark E. Ducart, the current acting warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

        [2] Street terrorism is the crime charged for active participation in any criminal street gang with the knowledge that its members engage in a pattern of criminal gang activity, in violation of California Penal Code § 186.22(a).

that he and his gang could commit their crimes with impunity." Dkt. 9-1 at 6.[3]  The

following facts are taken from the opinion of the Court of Appeal:

### May 22, 2003 (counts 3, 4, and 5)

Around 8:30 p.m. on May 22, 2003, Jorge Soto, his wife, Rene Martinez, their teenage daughter, Kelli, and a friend were walking down North Sanborn Street when a gold car with black tinted windows approached. Soto recognized two of the four occupants: defendant, a back seat passenger, and the driver, gang member Juan "Chucky" Ortiz, who lived on the same street as Soto used to. Defendant, Ortiz, and the two women passengers yelled gang slogans like "Norte" and "threw" four-fingered gang signs at the Soto group as they passed. The car made a u-turn and, when it caught up with the Soto group, stopped. The occupants got out and, as they approached, kept shouting "Norte" and throwing the hand signs. Ortiz was wearing all red. Soto testified that defendant said "one of these days they were going to get a hold of me, and he showed me the gun he had on his waistband." The gun had a chrome handle. The two women kept repeating "bitch, Norte" to Martinez and showed her the hand signs. At some point, defendant became worried someone would call the police and said, "Let's go. We're going to get him later."

Soto and his family reported the incident to the police. Kelli recognized both defendant and Ortiz from other incidents around the neighborhood. Kelli testified that Ortiz had threatened her father on more than one occasion and that they had even fought in the past. She also testified she had seen defendant driving around town with his friends in a "Lexus."

The report of this incident led to a parole revocation hearing for Ortiz. Soto did not testify because he was afraid that even reporting the incident would cause future problems with the gang. Ortiz's parole officer subpoenaed Martinez to testify at the hearing. She testified despite the parole officer's warning that it would be best for her to simply leave.

Defendant was charged in count 3, which was not presented to the jury for a verdict, with threats of violence against Soto, Martinez, and Kelli (Pen. Code, § 422) with the allegations that defendant used a handgun in the commission of the crime (§ 12022.5, subd. (a)) and that he committed the crime for the benefit of a criminal street gang with the intent to promote its criminal conduct. (§ 186.22, subd. (b)(1).) Count 4 alleged street terrorism (id., subd. (a)) with the personal use of a firearm (§ 12022.5) by actively participating in a criminal street gang with knowledge that the members engaged in a pattern of

---

[3] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

criminal activity and promoted felonious conduct by gang members.  Count 5 alleged that defendant exhibited a firearm (§ 417, subd. (a)(2)) in the presence of Soto, Martinez, and Kelli for the benefit of and with the intent to promote criminal conduct by gang members.  (§ 186.22, subd. (d).)

**July 2003 (counts 6, 7, and 8)**

At approximately 5:00 p.m. near the end of July, Francisco Medina walked from his house on Fremont Street down to the Azteca Market.  He had to pass by 501 Fremont Street, the house at the corner which was the center of Norteño gang activity.  The market was also on Norteño turf.  Medina purchased two sodas that came in glass bottles.

As Medina left the market, he saw defendant and Manuel Baeza, who lived four houses down the street from 501 Fremont Street.  They were both gang members Medina recognized from the neighborhood.  Medina had seen their tattoos (defendant had a tattoo in red of women's lips on his neck, and Baeza had the abbreviation of Fremont Street and an "x" and a "4").  They were with another man in the market parking lot.

Baeza demanded Medina's wallet.  When Medina refused, Baeza hit him in the face, knocking him to the ground, where the three men started kicking him.  The assault continued for about a minute.  As Medina stood up, defendant grabbed and held Medina and Baeza stabbed him in the back with a glass shard from one of the soda bottles.  When people came out of the market to investigate, the three assailants fled, taking Medina's wallet with them.

The piece of glass cut through Medina's jacket, shirt, and skin, and the wound bled so much that Medina later discarded the shirt.  The wound healed by the time of the trial, but the scar was still visible.  Medina did not seek treatment or report the matter to the police for fear of retaliation from defendant.  He was afraid that if defendant and his friends saw a police car near his house, they would "do something more against my family."

Medina believed the attack was in retaliation for his report of a prior incident involving his father, who was robbed and injured by the Norteños.  When Medina reported that incident to the police, "they told us it was a bad neighborhood, that we have to move out of the neighborhood."  Medina subsequently moved away from the area with assistance from the district attorney's office.

Defendant was charged in count 6 with a serious felony within the meaning of section 1192.7, subdivision (c)(19), and the second degree robbery of Medina (§ 211), with the allegation that defendant committed the crime for the benefit of and to promote criminal conduct by a criminal street gang.

(§ 186.22, subd. (b)(1).)[4]

**September 1, 2003 (counts 1 and 2)**

Around 7:30 p.m. on September 1, Soto, Martinez, their friend Mario, Kelli, and her friend Paige picked up Medina at his house to go to a movie. As they drove past 501 Fremont Street, they saw several persons dressed in red drinking beer out in front, and recognized defendant and Baeza. Defendant was dressed in a white football jersey with the number 5 or 05 on it in red.

As the Soto car passed by the house, either defendant or Baeza threw a beer bottle at the back of the car. The bottle smashed on the trunk. Baeza, standing next to defendant, motioned for him to hurry up and go inside the house. At that moment, a white "Lexus" drove down Fremont Street and pulled in front of them blocking their path. Medina recognized the driver as Oscar Porquero, a known Norteño associate of defendant. Soto wanted to get away as fast as possible and drove his car around the Lexus. He got a little way down the street but was stopped by a line of traffic waiting at a red light.

The occupants of the car looked back and saw defendant running down the street towards them with a gun in his hand. Martinez shouted to Kelli to get down, and Soto said something about a gun. When defendant reached the Azteca Market parking lot, he crouched down, pointed the gun at Soto's car, and fired two shots. One of the bullets went through the car's right rear fender and into the wheel well, coming to rest in the trunk between the back seat and the gas tank. Soto testified that if the path of the bullet veered "a little bit more, it would have hit the gas tank, and [defendant] could have killed the whole family."

Soto immediately drove to the nearest police station for help. However, no one was stationed at the front desk, so Martinez used the phone in the lobby with a direct line to the police 911 operator while everyone else waited outside. The tape of the 911 call was played for the jury over defendant's objection. During the call, Martinez described the shooting, the assailants, and the fact that she had previously testified against one of the gang members about an incident at which defendant—the shooter in this case—was also present. She spoke of Medina's stabbing and robbery, and Medina's father's robbery a few months earlier. "It's that little store. They hang out and they rob people. And then I had to take him [Medina's 56-year-old father] to the hospital with a busted head and he's

---

[4] Petitioner was also charged in count 7 with assault with a deadly weapon (Cal. Penal Code § 245(a)(1), with the allegation that he committed the crime for the benefit of a criminal street gang with the intent to promote its criminal conduct (id. § 186.22(b)(1)); and in count 8 with street terrorism (id. § 186.22 (a)). 1CT 271-272.

got a heart problem. And now they stabbed the son with a beer bottle, and now they're shooting at us!" Martinez repeatedly expressed fear for her family and explained that defendant and the gang were "partying" at a house only four doors away from her home.

Responding Officer Dagoberto Zubiate testified that he met the group in the police department lobby. Martinez was "upset, to the point she became hysterical; she was crying and pacing back and forth, and repeatedly told me that, you know, she was afraid for her safety, that she was afraid to testify, and she feared retaliation from the gang members."

Only Medina was willing to return to the scene with officers on the night of the shooting. Soto was concerned about giving his real name because of problems his family might face from defendant and the gang. However, all the victims gave statements to the officers and Soto, Medina, and Kelli identified defendant as the shooter.

Defendant was charged in count 1 with shooting at an occupied vehicle (§ 246) for the benefit of and with the intent to promote a criminal street gang (§ 186.22, subd. (b)(1)). Count 2 charged street terrorism (id., subd. (a)) with the personal use of a firearm (§ 12022.5, subd. (a)) which caused the offense to become a serious felony (§ 1192.7, subd. (c)(8)).

As to the latter count, the defense presented a single witness who suggested that defendant might not have been at the scene during the incident, and that if he was, he was incorrectly identified. However, Medina had walked by 501 Fremont Street less than an hour before the shooting, and had seen defendant standing out front along with eight or nine other Norteños drinking beer. Defendant's presence at the scene was also noted by several officers who observed him wearing the same football jersey minutes before the shooting when they drove to a nearby house to conduct a probation search of another Norteño gang member.

**Gang evidence**

The prosecution presented uncontested evidence that defendant was an active Norteño gang member. He and his associates had gang tattoos. Police searches of various gang hideouts yielded gang-related pictures, posters, CDs, clothing, weapons and ammunition. Lyrics from one of the CDs suggested the importance of "keeping their territory clean."

Gang expert Officer Vicky Burnett described the Norteños as an organization with a constitution that has 14 tenets, a set of instructions stating how members are expected to behave in and out of custody, and a structured leadership that collects tributes and extends all the way from the streets to the prison gangs. The gang finances its operations through drug sales and robberies. Members commit offenses, even petty

crimes, for the benefit of the gang on an almost daily basis.  In fact, virtually all crimes committed by members are for the benefit of the gang.  Money from the robberies and other offenses was commonly funneled back to incarcerated members of the Nuestra Familia prison gang.

Burnett stated that gang culture lives on intimidation and fear.  She listed a number of predicate crimes involving Norteños that were not committed against rival gang members, but were still specifically committed for the Norteño gang.  Gang members use violence and intimidation against innocent civilians not just to enhance their status in the gang, or their gang's status among other gangs in a particular area, but to intimidate residents on their turf so they can commit other crimes without the fear that the citizens will report them to the police or testify against them.  "If the victim and citizens of the community, and rival gang members fear them, they won't report these crimes and, therefore, they avoid prosecution."  The gang will specifically target those individuals that have testified against them in the past, or who have reported their actions to the police.  Burnett mentioned one incident in which a hospitalized gang member lunged at a witness in an effort to intimidate him when police brought the witness in to identify the suspect.

In Burnett's opinion, defendant, who had been shot weeks before the September shooting, would be expected to retaliate violently.  Burnett thought defendant would not necessarily retaliate against the rivals who injured him but would uphold his—and the gang's reputation—by inflicting seemingly random violence on virtually anyone, regardless of whether he or she was affiliated with a rival gang.  Eighty-five percent of "gang-related" shootings in Salinas are committed without regard for whether the victim is a gang member.  Burnett stated, "[The gang members] just don't care who it is.  They are just out to shoot somebody."

Shooting at a car that is on gang turf, even if the driver is not a member of a rival gang, benefits the shooter's gang because it is seen as an act of controlling their territory.  Moreover, a shooting committed in front of fellow gang members enhances the shooter's reputation and status within the gang, regardless of whether the victim is a rival gang member, because it shows that the shooter is not afraid to commit a violent act for the gang's benefit.

Moreover, the gang acts as a unit.  Thus, if one gang member is suspected of criminal behavior, other gang members will attempt to intimidate witnesses to prevent further statements to the police or testimony in court.

The victims in this case each testified about tremendous fear of retaliation from the gang.  Their statements were backed up by testimony from the officers who investigated the case.  Furthermore, both Medina and Soto testified that as they were testifying, defendant was flashing gang signs at them from his

> chair in court.  Numerous gang members were present at the
> courthouse roaming the halls and taking pictures of witnesses.
> A high ranking member of the Nuestra Familia was also seen in
> the halls at the courthouse.

People v. Avila, No. H028881, 2007 WL 1129204, at *1-3 (Cal. Ct. App. Apr. 17, 2007, as modified on denial of reh'g, May 17, 2007) (original footnote omitted; footnotes added).

### A.    CASE HISTORY

#### 1.    Conviction and Sentencing

On March 25, 2005, a jury convicted Petitioner of all charges, except for count 3 (threats of violence) which was not presented to the jury.  Answer, Ex. 1, vol. 2, Clerk's Transcript ("CT") 387-93; Avila, 2007 WL 1129204, *1-5.  The trial court found true all enhancements and acknowledged that Petitioner had admitted to a prior strike based on a juvenile adjudication for robbery, which pursuant to California Penal Code § 1170.12(c)(1), doubled any state prison commitment he would receive.  Avila, 2007 WL 1129204, *5.

At sentencing, the court relied on the robbery charge in count 6 as the base term. The court selected the three-year midterm, doubled to six years for the prior strike, plus ten years for the street terrorism enhancement.  The court added an eight-month consecutive term (doubled to sixteen months for the strike) for the street terrorism conviction in count 4. The court imposed an indeterminate term of fifteen years to life (doubled to thirty years because of the strike) for count 1, shooting at an occupied vehicle.  The court selected the upper term for the sentences on counts 2, 7, and 8 and stayed them and the sentence on count 5 under California Penal Code § 654.

#### 2.    Appeals

On June 3, 2005, Petitioner appealed the judgment to the California Court of Appeal ("Court of Appeal" or "state appellate court"), challenging the admissibility of certain evidence, the competency of counsel, and the trial court's selection of the upper term sentence.  Dkt. 9, Ex. 3.  In an unpublished opinion, filed on April 17, 2007, the state appellate court affirmed the judgment, but ruled in Petitioner's favor on his sentencing claim based on Blakely v. Washington, 542 U.S. 296, 303-04 (2004).  Blakely held that the

term "statutory maximum" meant "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  542 U.S. at 303.  On appeal, Petitioner had claimed that the trial court's imposition of an upper term sentence for counts 2, 7 and 8 violated <u>Blakely</u>.  In reviewing this claim, the state appellate court relied on the then recent United States Supreme Court decision in <u>Cunningham v. California</u>, 549 U.S. 270 (2007).  <u>Avila</u>, 2007 WL 1129204, *18-19.  In <u>Cunningham</u>, the Supreme Court held California's determinate sentencing law violates the Sixth Amendment because it authorizes the judge, not the jury, to find the facts permitting an upper term sentence.  <u>See</u> 549 U.S. at 288-89, 293.  The state appellate court found that the trial court's finding of aggravating factors based on a preponderance of evidence may not be relied upon to impose an upper term sentence.  As a result, the state appellate court amended the judgment to reflect midterm sentences on counts 2, 7 and 8.  <u>Avila</u>, 2007 WL 1129204, *18-19.[5]

On April 26, 2007, Petitioner filed a Petition for Rehearing in the California Court of Appeal.  Dkt. 19-1 at 38-44.  Petitioner alleged that the state appellate court failed to address his claim that "trial counsel provided ineffective assistance of counsel because he failed to object to the use of [his] juvenile adjudication as a strike prior."  <u>Id.</u> at 41.  On May 17, 2007, the state appellate court issued an Order Modifying Opinion and Denying Petition for Rehearing.  Dkt. 9, Ex. 7.  No change in judgment occurred, modifications to certain language in the opinion were made, and the petition for rehearing was denied.  <u>Id.</u>

On May 25, 2007, Petitioner filed a petition for review with the California Supreme Court, raising all his claims on direct appeal except for the aforementioned sentencing claim.  Dkt. 1, Ex. C.  The California Supreme Court denied the petition for review on July 11, 2007.  Dkt. 1, Ex. B.

---

[5] However, because the upper term sentences had been stayed by the trial court, there was no change in Petitioner's length of confinement, even though they were reduced to midterm sentences.

### 3.      Federal Court Proceedings

On June 9, 2008, Petitioner filed his original federal petition, which alleges the claims raised on direct appeal, including the sentencing claim.  Dkt. 1.  On October 28, 2008, the Court issued an Order to Show Cause why the writ should not be granted.  Dkt. 5.  Before Respondent filed its Answer in respect to the Order to Show Cause, Petitioner filed a motion to stay so that he could exhaust both "the issues [he] submitted to this Court" as well as "new issues."  Dkt. 7 at 1.  On February 17, 2009, the Court found that the petition was a mixed petition because the sentencing claim was not presented to the California Supreme Court in his petition for review.  Dkt. 8 at 1.  The Court also noted that Petitioner had failed to exhaust state court remedies with respect to any alleged "new issues."  Id. at 2.  Therefore, the Court stayed the action and allowed Petitioner to exhaust his unexhausted claims in state court.  Dkt. 8 at 3.  On February 24, 2009, Respondent filed an Answer (Dkt. 9) in response to the original petition, apparently unaware the case had been stayed.  Dkt 19 at 5.

On February 18, 2010, Petitioner filed a state habeas petition in the California Supreme Court raising his sentencing claim, now predicating it on Cunningham.  On September 1, 2010, the California Supreme Court denied the petition.  This Court subsequently granted Petitioner's motion to file an amended petition raising his sentencing claim.  Dkt. 16.  Respondent subsequently filed a supplemental answer, and Petitioner filed a traverse.  Dkts. 19, 26.  The matter is now ripe for adjudication.

## II.    LEGAL STANDARD

The instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Under AEDPA, a federal court cannot grant habeas relief with respect to any claim adjudicated on the merits in a state-court proceeding unless the proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks omitted).

On federal habeas review, the district court reviews the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-804 (1991).  In the absence of a decision from the highest state court, the Court "looks through" to the "last reasoned decision" addressing the particular claim.  Id.; Shackleford v. Hubbard, 234 F.3d 1072, 1079, n.2 (9th Cir. 2000).  Here, the Court of Appeal's decision on direct appeal is the last reasoned decision to address the majority of Petitioner's claims.  The sentencing claim was presented only to the California Supreme Court on state habeas, which summarily denied relief.  "Thus, when the state court does not supply reasoning for its decision, [the court is] instructed to engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable."  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (internal quotations and citations omitted).

## III.   DISCUSSION

Petitioner asserts the following claims:

1.      Insufficient evidence supports the gang participation enhancement in connection with count 6 (the July 2003 robbery of Medina);

2.      The trial court erred in admitting the tape of Martinez's call to 911 after the September 1, 2003 incident;

3.      Trial counsel provided ineffective assistance by failing to  (a) object to testimony that gang members had congregated outside the courtroom, (b) request an evidentiary hearing on juror misconduct based on potential juror bias from observing gang

1  members inside and outside the courtroom, and (c) object to the use of Petitioner's juvenile

2  adjudication as a strike;

3         4.      The trial court erred in relying on the prior juvenile adjudication as a strike to

4  double his sentence; and

5         5.      The trial court violated Cunningham and his right to a jury trial by imposing

6  an upper term sentence on counts 2, 7 and 8.

7         The Court addresses these claims seriatim.

8      **A.   SUFFICIENCY OF THE EVIDENCE**

9         Evidence is constitutionally sufficient to support a conviction—or in this case an

10  enhancement—when, upon "viewing the evidence in the light most favorable to the

11  prosecution, *any* rational trier of fact could have found the essential elements of the crime

12  beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in

13  original).  The reviewing court must presume that the trier of fact resolved any conflicts in

14  the evidence in favor of the prosecution, and must defer to that resolution.  Id. at 326.  "A

15  jury's credibility determinations are therefore entitled to near-total deference under

16  Jackson."  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

17        Under AEDPA, a federal habeas court applies Jackson "with an additional layer of

18  deference."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  First, a reviewing court

19  defers to the factfinder's resolution of all conflicting evidence, overturning the jury's

20  verdict "only if no rational trier of fact could have agreed with the jury."  Coleman v.

21  Johnson, — U.S. —, 132 S. Ct. 2060, 2062 (2012) (per curiam).  Second, a habeas court

22  must sustain a state court decision rejecting a sufficiency-of-the-evidence challenge unless

23  the decision reflects an unreasonable application of the Jackson standard.  Juan H., 408

24  F.3d at 1274-75.  In other words, to grant habeas relief, a federal court must conclude that

25  "the state court's determination that a rational jury could have found that there was

26  sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable

27  doubt, was objectively unreasonable."  Boyer v. Belleque, 659 F.3d 957, 964-65 (9th Cir.

28  2011).

1  Federal habeas review of a state court ruling on sufficiency of the evidence is

2  performed "with explicit reference to the substantive elements of the criminal offense as

3  defined by state law." Jackson, 443 U.S. at 324 n.16.  Here, Petitioner argues that

4  insufficient evidence supported the gang enhancement under California Penal Code

5  § 186.22(b)(1) as to the charge based on the July 2003 robbery of Medina.  "To subject a

6  defendant to a gang enhancement (§ 186.22(b)(1)), the prosecution must prove the

7  underlying crime was 'committed for the benefit of, at the direction of, or in association

8  with any criminal street gang' (the gang-related prong), 'with the specific intent to promote,

9  further, or assist in any criminal conduct by gang members' (the specific intent prong)."

10  People v. Rios, 222 Cal. App. 4th 542, 705 (2013) (citation omitted).  Section 186.22(a)

11  was enacted for the specific purpose of eradicating criminal activity by street gangs "whose

12  members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens

13  of their neighborhoods."  People v. Rodriguez, 55 Cal. 4th 1125, 1129-30 (2012) (citing

14  Cal. Penal Code §§ 186.21-22).

15  Petitioner contends that there was no evidence that the Medina robbery was for the

16  benefit of a gang because neither Medina nor any of the witnesses to the robbery testified

17  that the assailants wore gang colors, threw gang signs, uttered any gang words or in any

18  way identified themselves as gang members.  In rejecting this claim, the state appellate

19  court found that substantial evidence was presented to establish Petitioner's gang

20  membership and that the robbery benefitted a criminal street gang.  Petitioner conceded

21  during voir dire that he was a gang member, and evidence was presented that he regularly

22  wore clothing and had tattoos associated with Norteños, frequented locales associated with

23  the gang, and regularly associated with other Norteños.  In addition, Soto, Martinez, Kelli,

24  and Medina testified that they knew that Petitioner was a gang member, and that he had

25  been seen drinking beer in the front yard with other gang members before the shooting in

26  September 2003.

27  The record also showed that Soto, Martinez, Kelli, and Medina had been the target

28  of intimidating activity by Petitioner in the past because they had either reported crime

committed by Petitioner's gang to authorities or testified against various members of his

gang.  For example, Medina believed the robbery in July 2003 was in retaliation because he

had reported a gang-related assault and robbery of his father in the past.  Officer Burnett

testified that robberies (similar to the July 2003 Medina robbery) benefitted the gang

monetarily and enhanced its reputation by instilling fear in the community.  Such

intimidation, Officer Burnett testified, facilitated the gang's ability to continue their

criminal conduct without fear of prosecution.[6]  Avila, 2007 WL 1129204, *6-8; see also

Answer, Ex. 2, vol. 4, Reporter's Transcript ("RT") 736-737, 4RT 740.  Though largely

circumstantial, the evidence presented was sufficient for the jury to draw the requisite

inferences to find that the robbery was committed to benefit the gang.  People v. Miranda,

192 Cal. App. 4th 398, 411-412 (2011) ("There is rarely direct evidence that a crime was

committed for the benefit of a gang.  For this reason, 'we routinely draw inferences about

intent from the predictable results of action.  We cannot look into people's minds directly to

see their purposes.  We can discover mental state only from how people act and what they

say.'").

        The evidence presented at trial, which is summarized only briefly above, is more

than sufficient to sustain an enhancement under California Penal Code § 186.22.  See

People v. Albillar, 51 Cal. 4th 47, 63 (2010).  In Albillar, the state court held as follows:

"Expert opinion that particular criminal conduct benefitted a gang by enhancing its

reputation for viciousness can be sufficient to raise the inference that the conduct was

'committed for the benefit of . . . a [ ] criminal street gang' within the meaning of section

186.22(b)(1)."  Id.  The Ninth Circuit has found that "Albillar is binding on this court in

federal habeas cases" on the ground that a state court's interpretation of state law binds a

federal court sitting in habeas corpus.  Bonilla v. Adams, 423 Fed. Appx. 738, 739-740,

---

[6] It is also noteworthy that Officer Burnett testified that "numerous Norteños had
been seen in and around the courthouse, and that they had cell phones which were capable
of taking pictures of potential witnesses in an effort to intimidate them" and that Petitioner
had thrown up gang signs at Medina and Soto as they testified at the trial.  Avila, 2007 WL
1129204, *8

2011 WL 1058181, at *1 (9th Cir. Mar. 21, 2011) ("The <u>Albillar</u> court's determination that the evidence in that case satisfied the specific intent element of a gang enhancement finding compels us to conclude that the district court did not err in determining that Bonilla was not entitled to relief on the ground of insufficiency of the evidence.").[7]

In sum, the Court finds objectively reasonable the state appellate court's determination that a rational jury could have found sufficient evidence to support the gang enhancement under Penal Code § 186.22(b).  <u>See</u> <u>Juan H.</u>, 408 F.3d at 1274-75.  Because the state appellate court's conclusion was not objectively unreasonable, or contrary to or an unreasonable application of clearly established Supreme Court precedent, relief on this claim is DENIED.

### B.   ADMISSION OF 911 TAPE

Over the objection of Petitioner, the trial court permitted the jury to hear a recording of the 911 call made by Martinez.  Petitioner alleges that because Martinez did not testify at trial, the admission of her statements on the 911 tape denied him a fair trial on the grounds that: (1) it did not meet the requirements of the spontaneous statement exception to the hearsay rule and (2) Martinez's out-of-court statements were testimonial and, thus, violated his Sixth Amendment right to confront Martinez as a witness against him.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999).  The mere failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process

---

[7] Petitioner's reliance on <u>Garcia v. Carey</u>, 395 F.3d 1099, 1104 (9th Cir. 2005) is misplaced. Dkt. 26 at 11-14.  In <u>Garcia,</u> the only evidence relating to a gang was that the defendant was a gang member and that he robbed the victim in an area known to be in that gang's turf.  395 F.3d at 1103.  The court held that this was insufficient to establish that the robbery of the victim was intended to further other criminal activity of the gang.  <u>Id.</u>  In the instant case, there was extensive evidence, including Petitioner's concession/admission that he was a member of the Norteños and that he robbed Medina in Norteños territory.  There was also specific evidence linking this robbery to the benefit of the gang because it served to enhance Petitioner's status with the gang and to help intimidate citizens in Norteños' territory from reporting the gang's illegal activities.

grounds.  Henry, 197 F.3d at 1031; Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).  Only if the jury can draw no permissible inferences from the evidence can its admission violate due process.  Jammal, 926 F.2d at 920.

   As an initial matter, to the extent that Petitioner is challenging the admission of allegedly prejudicial evidence—such a claim does not present a violation of clearly established federal law as required for habeas relief under AEDPA.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that the Supreme Court has not yet clearly ruled that the admission of irrelevant or overtly prejudicial evidence constitutes a due process violation).  Absent "clearly established federal law," a federal court evaluating a habeas claim cannot conclude that a state court's admission of evidence was contrary to, or unreasonably applied, Supreme Court precedent.  Wright v. Van Patten, 552 U.S. 120, 126 (2008).  Accordingly, the admission of the 911 tape, as a matter of law, does not warrant habeas relief since there is no controlling Supreme Court precedent for the state appellate court's decision to contravene.  Even if the claim were cognizable, for the reasons that follow, the Court finds that it fails on the merits.

### 1.    Spontaneous Statement Hearsay Exception

   The spontaneous statement exception to the hearsay rule provides as follows: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  Cal. Evid. Code § 1240.  Petitioner contends that the 911 tape failed to meet the requirements of the spontaneous statement exception because "the statements on the tape were not a product of the speaker's stressful experience, but rather the result of ten to fifteen minute's reflection on the event with other witnesses."  Dkt. 26 at 8.

1    In determining that Martinez's statements were admissible, the trial court considered

2  the parties' arguments outside the presence of the jury.  3RT 255-260; 4RT 680-682; see

3  also 1CT 278.  Petitioner's attorney objected to the admission of the 911 tape, arguing that

4  it did not qualify under the spontaneous statement exception.  3RT 256-257.  The trial court

5  overruled the objection, finding that Martinez's statements on the 911 tape were made

6  under the stress and excitement of the shooting, which occurred only ten minutes before the

7  call.  The state appellate court agreed with that determination, finding, among other things,

8  that Martinez was crying, upset and hysterical, and was extremely fearful of retaliation by

9  gang members.  The court found that "[t]he language Martinez employed during the call

10  shows a lack of reflection" and was "apparently generated from her own internal responses

11  to a life-threatening, frightening attack."  Avila, 2007 WL 1129204, *9.

12    The trial court's factual finding that Martinez's statements were spontaneous within

13  the meaning of California Evidence Code § 1240 is entitled to a presumption of correctness

14  under § 2254.  Dyer v. Calderon, 151 F.3d 970, 975 (9th Cir. 1998) ("So long as the fact-

15  finding process is objective and reasonably explores the issues presented, the state trial

16  judge's findings based on that investigation are entitled to a presumption of correctness.");

17  To rebut this presumption, a petitioner must present clear and convincing evidence

18  establishing that the state court's finding was erroneous.  See 28 U.S.C. § 2254(e)(1);

19  Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004)  ("Once the state court's fact-finding

20  process survives this intrinsic review [,] . . . the state court's findings are dressed in a

21  presumption of correctness [ ]" and may be overturned only if new evidence presented for

22  the first time in federal court "amounts to clear and convincing proof that the state-court

23  finding is in error.").  Here, Petitioner has failed to demonstrate any flaw in the trial court's

24  fact-finding process, or present any evidence, let alone clear and convincing evidence, to

25  support his claim.  As such, the Court may properly defer to the state court's findings.

26    In addition, there were many permissible inferences that the jury could draw from

27  Martinez's 911 tape.  The state appellate court noted that the 911 tape was relevant to the

28  shooting, because Martinez recounted how Petitioner shot at her car, and that her references

to actions aside from the shooting were relevant to "narrate, describe or explain" the shooting incident.  Avila, 2007 WL 1129204, *9-10.  The state appellate court also noted that Martinez's statements explained the shooting incident by providing details about the identity of the individuals involved in blocking the car before the shooting and in the shooting itself and by providing evidence that the motive for the shooting was potentially gang related.  Id., *10.  Therefore, the admission of the 911 tape did not violate Petitioner's due process right to a fair trial.  See Jammal, 926 F.2d at 920; Holley, 568 F.3d at 1101.

### 2.    Confrontation Clause

Equally without merit is Petitioner's ancillary contention that admitting the tape violated his rights under the Confrontation Clause of the Sixth Amendment.

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  Id.  The Confrontation Clause pertains exclusively to "testimonial" statements made for the purpose of creating an out-of-court substitute for trial testimony.  See Michigan v. Bryant, — U.S. —, 131 S. Ct. 1143, 1155 (2011).  Conversely, when substitution for trial testimony is not the primary purpose, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause."  Id. at 1155.  The formality of the interrogation, or the lack of it, may inform the court's inquiry as to its "primary purpose."  Id. at 1160. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  Davis v. Washington, 547 U.S. 813, 822 (2006).

Petitioner argues that Martinez's out-of-court statements on the 911 tape were testimonial, and therefore, he should have been afforded the opportunity to cross-examine

her.  Not so.  As the state appellate court reasonably found, "the trial court's assessment of

the circumstances surrounding the making of the statement shows that the statement was

made for the purpose of obtaining assistance during an ongoing emergency."  <u>Avila</u>, 2007

WL 1129204, *11.  "Martinez's statements were excited utterances not made in response to

'structured police questioning' despite the operator's attempts to calm her."  <u>Id.</u>  The state

appellate court quoted from the transcript of the 911 call, which shows that Martinez was

worried about their safety, and that the 911 operator tried to calm her down:

> . . . [OPERATOR]:  "Ma'am! I can't help you if you are going to yell at me.  You're in the Police Department!  [¶] [MARTINEZ]:  My kids are outside.  [¶]  [OPERATOR]: Listen to me! Where did this happen?"  When Martinez started to convey the information, the operator interposed, "Hold it, ma'am calm down. Stop! Slow down!  [¶] [MARTINEZ]: Well, have you had guns shooting at you?  [¶] [OPERATOR]: Ma'am!  [¶]  [MARTINEZ]:  I'm scared!  [¶]  [OPERATOR]: Ma'am! You're in the police department-you understand that? I think you're pretty safe.  And I can't help you if you're all excited."
>
> A little later, the operator said, "Ma'am, just take it easy and answer my questions as they're asked and it'll go real smooth. What is your name?"  Martinez answered the question, but added, "But lemme [sic ] tell you something real quick.  I just testified against somebody that pulled a gun on me and my daughter and a little three year old girl on Sanborn."  Martinez kept talking with occasional interruptions by the operator  ("Ok, Ma'am!"  "Hold on please."  "Ok, hold on for a sec . . .") as the operator tried to interpose questions.  Finally, the operator said, "Ok, I understand that you are worked up, but you're in the police station, you are about as safe as you can get right now, ok?"  The operator finally told Martinez to bring everybody inside the police department, lock the doors, and stay inside and the tape ended.

<u>Id.</u>  As shown above, although the 911 operator posed questions to Martinez, it was for the

purpose of ascertaining what had occurred as opposed to obtaining evidence for a criminal

prosecution.  Indeed, many of Martinez's answers were not directly responsive to the

operator's questions; instead, it is evident that she was reporting an ongoing crime, a

situation which she obviously believed placed her and her family in immediate peril.  <u>Id.</u>,

*11-12.

In sum, the 911 recording comports with the definition of nontestimonial statements articulated by the Supreme Court in <u>Davis</u>, as its primary purpose was to enable the police to assist in meeting an ongoing emergency, not to establish or prove past events that might be relevant to a later prosecution.  <u>See</u> 547 U.S. at 822; <u>see</u> <u>id.</u> at 821-23, 826-29 (holding victim's initial statements in response to 911 operator's interrogation were not testimonial because the elicited statements, i.e., naming her assailant, were necessary to  resolve the present emergency).  The state appellate court's decision finding Martinez's statements <u>nontestimonial</u> was therefore not an unreasonable application of Supreme Court precedent.

Even if there were a Confrontation Clause violation, any such error resulted in no prejudice.  A plethora of gang evidence connected Petitioner and his associates to each of the three incidents, and evidenced their motivations for the attacks.  Expert witnesses provided a host of gang-related indicia that had been seized from the various members residences, including arms, ammunition, photographs, clothing, posters, writings, CD's and other evidence.  <u>See, e.g.</u>, 3RT 673.  Medina, Soto, and Kelli likewise testified regarding the campaign of terror by Petitioner and his gang associates over the past months.  This testimony was woven together by Officer Burnett, who explained how Petitioner and his gang thrived on instilling fear into the community.  The evidence against Petitioner was substantial.  Thus, even if there were error of a constitutional magnitude—which there was not—the admission of the 911 tape could not have had a substantial and injurious effect on the verdict.  <u>See</u> <u>Brecht</u>, 507 U.S. at 637.

Accordingly, the Court finds that the state appellate court's rejection of Petitioner's claim based on the allegedly erroneous admission of the 911 tape was neither contrary to nor involved an unreasonable application of clearly established federal law.  Therefore, this claim is DENIED.

## C.   IAC CLAIMS

An IAC claim under the Sixth Amendment is reviewed under the two-prong test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Under the first prong, the defendant must show "that counsel's representation fell below an objective standard of

reasonableness." Id. at 688.  Because of the difficulties inherent in fairly evaluating counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687.  To satisfy the second prong under Strickland, petitioner must establish that he was prejudiced by counsel's substandard performance.  See Gonzalez v. Knowles, 515 F.3d 1006, 1014 (9th Cir. 2008) (citing Strickland, 466 U.S. at 694).

Under AEDPA, a federal court is not to exercise its independent judgment in assessing whether the state court decision applied the Strickland standard correctly; rather, the petitioner must show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner.  Bell v. Cone, 535 U.S. 685, 699 (2002); see also Cullen v. Pinholster, — U.S. —, 131 S. Ct. 1388, 1403 (2011) (federal habeas court's review of state court's decision on ineffective assistance of counsel claim is "doubly deferential."). The Supreme Court has specifically warned that: "Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Harrington v. Richter, 562 U.S. 86, __, 131 S. Ct. 770, 789 (2011) (emphasis added).

### 1.    Presence of Gang Members

Petitioner argues that counsel was ineffective for failing to object to the gang expert's testimony that gang members were "roaming the courthouse" and in failing to seek the exclusion of such testimony as hearsay.  The state appellate court ruled that counsel was not ineffective because, even if he had objected to this evidence, it would not have been excluded.  Citing People v. Hernandez, 33 Cal. 4th 1040, 1049 (2004), the state appellate court held that evidence of gang affiliation "is relevant and admissible regarding a charged offense, as evidence can help prove identity, motive, modus operandi, specific intent,

means of applying force or fear, or other issues pertinent to guilt." Avila, 2007 WL 1129204, *14. As to Officer Burnett's testimony that gang members were "roaming" and surveilling the courtroom, the state appellate court found that his testimony was not hearsay, since it was based on his personal observations. Id. The court further noted that the evidence was particularly relevant to a factual issue before the jury because Petitioner was charged not only with the underlying crimes, but also with gang enhancements. Id. Finally, citing People v. Sanchez, 58 Cal. App. 4th 1435, 1449-1450 (1997), the state appellate court noted that the evidence of threats by gang members against witnesses and these witnesses' fear of retaliation is admissible to assist the jury in assessing the credibility of the witnesses. Id.

The state appellate court's decision comports with the state law cited in its opinion as well as federal law. E.g., United States v. Santiago, 46 F.3d 885, 890 (9th Cir. 1995) (recognizing that gang-related testimony relating to the witnesses' fear of retaliation was admissible on the issue of credibility irrespective of whether the defendant is a gang member). Based upon the highly probative value of this evidence, the state appellate court's conclusion that it would not have been excluded, even if counsel had objected, is not unreasonable. Counsel's performance cannot be deemed deficient for failing to make a meritless objection. See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996); see also Jammal, 926 F.2d at 919 (as long as jury can draw a rational inference from evidence, its admission does not violate due process). Based on the foregoing, the Court finds that there is a "reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 131 S. Ct. at 789.

### 2. Evidentiary Hearing

Petitioner next contends that counsel should have moved for an evidentiary hearing to determine "whether any jurors were biased by their own observations of gang members inside and outside the courtroom. . . ." Dkt. 1 at 3. According to Petitioner, following Officer Burnett's testimony, jurors sent the trial judge a note (written by the bailiff) that they had "observed gang members within the building and in the court room," and

expressed concerns about "potentially being photographed by gang members with cell

phones."  Avila, 2007 WL 1129204, *15 & n.5.  The note also stated that jurors should

"park far away from the court house and might be harassed by gang members as [they] go

to and from their vehicles."  Id.

The next morning, the court received another note from a juror describing her fear

and stating that she would not be able to reach a decision in the case.  Id.  After holding an

in-chambers hearing, the judge excused the juror for cause.  Id.  Defense counsel expressed

concern that other jurors may have similar issues, and requested that the court make such an

inquiry of the other jurors.  The judge declined to do so, but informed the jury that, in

response to concerns expressed by some jurors, a bus would take them to their cars and that

a bailiff would be on the bus.  Id.  He added:

> So I have no specific reason to feel that there's any problem.
> We took some action to assuage some of the concerns some
> jurors had, and I don't want to make it appear that-that those
> concerns have any actual basis.  But at the same time where
> people have those concerns, I don't want to just leave them
> worrying about them either.  That's why we did what we did.

Id.

In rejecting Petitioner's IAC claim, the state appellate court first determined that

there was no juror misconduct.  Id., *15-18.  The court explained that, during trial,

testimony was presented generally and specifically regarding witness intimidation, which

included Officer Burnett's testimony regarding her observations of a gang presence at the

courthouse.  Id.  As such, "[t]he jurors could not help but observe examples of that behavior

while they were about their lawful business coming and going to the courtroom."  Id., *16.

In view of these circumstances, the state appellate court found that "there was no juror

misconduct for defense counsel to seek inquiry into," particularly since there were "no

complaints by the jurors that gang members attempted communication, gestured, or

displayed weapons to them" or "[complaints] that photographs had been taken of them or

that they had been harassed going to and from their cars."  Id.  The court concluded that

"there was no substantial likelihood that the jurors were actually biased in the sense that

they were unable to render a verdict based solely on the evidence received at trial," and

therefore, "there was no ineffective assistance of defense counsel in failing to request an evidentiary hearing or a mistrial as defendant complains."  Id., *17.

Clearly established Supreme Court law does not require state or federal courts to conduct a hearing in all cases where a claim of juror bias is raised.  Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003) (citing Smith v. Phillips, 455 U.S. 209, 218 (1982)); see, e.g., Estrada v. Scribner, 512 F.3d 1227, 1241 (9th Cir. 2008) (district court did not abuse its discretion in declining to hold hearing on juror bias where state court's determination was not unreasonable in finding two jurors were not actually biased, and that juror bias could not be presumed based on jurors' honesty during voir dire); Sims v. Rowland, 414 F.3d 1148, 1153 (9th Cir. 2005) (trial court need not order a hearing sua sponte whenever presented with evidence of juror bias).[8]  Moreover, it was reasonable for the state appellate court to conclude that there was no substantial likelihood of bias by jurors, given that none of them were threatened, intimidated or contacted by any gang members.  Avila, 2011 WL 1129204, *16.  Finally, as reasonably found by the state appellate court, under these circumstances, trial counsel was not deficient for failing to request a hearing regarding the jurors' concerns for their safety, because none was warranted.  See Juan H., 408 F.3d at 1273 (counsel's performance not deficient for failing to raise meritless objection); Rupe, 93 F.3d at 1445 (failure to take a futile action can never be deficient performance).  Under the doubly-deferential standard applicable to IAC claims ruled upon by a state court, the Court finds that there is a "reasonable argument that counsel satisfied Strickland's deferential standard."  Harrington, 131 S. Ct. at 789.

---

[8] The Court finds unavailing Petitioner's reliance on Norris v. Risley, 918 F.2d 828 (9th Cir. 1990) where the witnesses in Norris's rape trial wore "Women Against Rape" buttons, which the Ninth Circuit considered as an implied message to find the defendant guilty.  In the instant case, the mere presence of alleged gang members in and around the courtroom did not infringe on Petitioner's presumption of innocence.  Meanwhile, the other cases cited by Petitioner in his traverse are distinguishable, as none of them involved situations, such as the instant case, where there was no evidence of contact between jurors and any gang member or witness.  See Turner v. La., 379 U.S. 466, 468-69 (1965); United States v. Henly, 238 F.3d 1111, 1116-17 (9th Cir. 2001); Caliendo v. Warden of Cal. Men's Colony, 365 F.3d 691, 693, 696 (9th Cir. 2004); United States v. Dutkel, 192 F.3d 893, 894, 898 (9th Cir. 1999).

### 3.     Failure to Object to Juvenile Adjudication

Finally, Petitioner contends his counsel was ineffective for failing to object to using the prior juvenile adjudication for robbery as a basis for imposing a strike.  Petitioner cites United States v. Tighe, 266 F.3d 1187, 1194 (9th Cir. 2001), which held that a prior juvenile adjudication could not be used to increase a federal sentence because the issue had not been presented to the jury.  However, the Ninth Circuit has acknowledged that Tighe is in conflict with the decisions of California appellate courts and other federal circuits, and, importantly, concluded that Tighe did not represent clearly established federal law as determined by the Supreme Court of the United States.  Boyd v. Newland, 467 F.3d 1139, 1151-52 (9th Cir. 2006).  Boyd held that, for purposes of federal habeas proceedings, a California court's use of a juvenile adjudication as a sentencing enhancement cannot be contrary to or involve an unreasonable application of Supreme Court precedent.  Since it is clear that any objection to the juvenile adjudication would have been futile, counsel's failure to object does not constitute deficient performance.  Juan H., 408 F.3d at 1273; Rupe, 93 F.3d at 1445.  Thus, there is a "reasonable argument that counsel satisfied Strickland's deferential standard."  Harrington, 131 S. Ct. at 789.

Accordingly, Petitioner's IAC claims are DENIED.

### D.     IMPROPER USE OF JUVENILE ADJUDICATION TO DOUBLE SENTENCE

Petitioner claims that the trial court erred in relying on his juvenile adjudication as a basis to double his sentence.  This claim has not been exhausted and it is not properly before the Court.  Even if it were exhausted, it fails on the merits.  See 28 U.S.C. § 2254(b) (the court may reach the merits of an unexhausted claim).  As set forth above, the Ninth Circuit has held that California courts may properly rely on a juvenile adjudication as a strike to enhance a sentence.  Boyd, 467 F.3d at 1151-52.

Petitioner's related double jeopardy claim also fails.  Dkt. 17 at 8-11.  The double jeopardy clause guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V; Benton v. Maryland, 395 U.S. 784 (1969).  Double jeopardy protections do not extend to sentencing proceedings because

- 24 -

sentencing determinations do not place a defendant in jeopardy for an "offense."  Monge v. California, 524 U.S. 721, 728 (1998); Witte, 515 U.S. at 400.  Because double jeopardy concerns are inapposite to sentencing proceedings or to sentencing enhancements, the Court finds no merit to Petitioner's double jeopardy claim.

Accordingly, this claim is DENIED.

### E.   CUNNINGHAM CLAIM

Petitioner argued in his state court appeal that the trial court could not impose the upper term for counts 2, 7 and 8 (i.e., two charges of street terrorism and one of assault with a deadly weapon).  Respondent conceded in the state appellate proceedings that Petitioner's contention was supported by Cunningham.  Consequently, the state appellate court amended Petitioner's judgment to reflect the middle term on counts 2, 7, and 8, instead of the upper term sentence that the trial court had imposed.  Avila, 2007 WL 1129204, *18.  Because the relief on this claim has already been granted, the claim is DENIED as moot.

## IV.   CONCLUSION

The Court finds no merit to any of the claims alleged in this action.  In addition, no certificate of appealability is warranted in this case.  For the reasons set forth above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court, but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.  Accordingly,

IT IS HEREBY ORDERED THAT all claims set forth in the Petition and Amended Petition are DENIED, and a certificate of appealability will not issue.  The Clerk shall enter judgment, close the file, and terminate any pending matters.

IT IS SO ORDERED.

Dated:  9/30/14

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge